**In re STAPLES, INC. SHAREHOLDERS LITIGATION.**

**Civ. A. No. 18784.**

Court of Chancery of Delaware, New Castle County.

Submitted: June 4, 2001.

Decided: June 5, 2001.

Michael Hanrahan, Gary F. Traynor, and Paul A. Fioravanti, Jr., of Prickett Jones & Elliott, Wilmington; Jay W. Eisenhofer, Cynthia A. Calder, and John C. Kairis, of Grant & Eisenhofer, Wilmington; of counsel: Richard S. Schiffrin, Robert B. Weiser, and Eric Zagar, of Schiffrin

& Barroway, Bala Cynwyd, Pennsylvania, Co–Lead Counsel, for Plaintiffs.

Jesse A. Finkelstein and Peter B. Ladig, of Richards, Layton & Finger, Wilmington; of counsel: Jeffrey B. Rudman, Daniel W. Halston, and Michael G. Bongiorno, of Hale and Dorr, Boston, Massachusetts, for Defendants.

## OPINION

STRINE, Vice Chancellor.

In this opinion, the court considers a motion to enjoin a June 11, 2001 vote on a reclassification of the common stock of Staples, Inc. (the "Reclassification"). By the vote, the Staples board hopes to eliminate the company's tracking common stock, which tracks the performance of the company's e-commerce operations, Staples.com. The Reclassification involves the exchange of Staples.com stock for shares of the company's traditional common stock, so-called "Staples RD" shares. The Staples.com shares are being valued at $7 per share in the Reclassification. The Reclassification requires the affirmative votes of both the Staples RD shareholders and the Staples.com shareholders, as separate classes.

As originally announced, the transaction would have included an exchange of Staples.com shares by the Staples board members, who had paid $3.25 for each of their shares. In the face of intense criticism, the Staples board decided not to participate in the transaction, and instead traded in their Staples.com shares for the price they paid for them, without interest. In addition, the Staples board traded in their unexercised Staples.com options for no consideration.

Not satisfied with this roll-back, the plaintiffs—who own Staples RD stock— seek a preliminary injunction against the procession of the Reclassification. They contend that the Reclassification remains tainted by the Staples directors' self-interest and is based on an inflated valuation of the Staples.com stockholders that is unfair to Staples RD holders. The stockholder plaintiffs also argue that the Staples board has failed to disclose all the material facts necessary for the Staples RD stockholders to vote on the Reclassification in an informed manner, and raise certain other arguments.

After evaluating the numerous arguments made by the parties, the court concludes that it will not review the substantive fairness of the proposed Reclassification as a basis for awarding an injunction. The Staples RD and Staples.com stockholders are being afforded the opportunity to decide the fairness of the matter for themselves. Therefore, a pre-emptive decision by the court to take the matter out of their hands is unwarranted.

Because, however, the proxy statement does not fully and fairly disclose all material facts relevant to the Reclassification vote, a preliminary injunction will issue to permit the defendants to make corrective and supplementary disclosures. This necessary delay will also permit the defendants to set a new record date, because their original attempt to set a record date did not comply with 8 *Del. C.* § 213.

### I. *Factual Background*

#### A. *The Creation Of Staples.com*

Staples is a retailer specializing in the provision of office supplies. Staples launched Staples.com in November 1998 to capitalize on the opportunities presented to retailers by the internet and in response to internet initiatives by rivals, Office Depot and Office Max. The company selected one of its stand-out executives, Jeanne Lewis, to head the new internet business.

Staples.com complemented Staples' existing business, which was centered on its stores and catalog sales, by enabling customers to buy from Staples over the internet. This internet capability also provided Staples customers with access to a greater variety of products than could be kept in inventory in stores. While Staples.com was a far more aggressive move into "e-tailing" than Staples had theretofore made, Staples.com did absorb Staples' pre-existing internet businesses, which had been designed to serve targeted elements of Staples' customer base.

A year later, the Staples board decided to create a series of Staples common stock that would track the performance of Staples.com. This decision came near the height of internet fervor, a time when established, profitable companies like Staples were having trouble retaining employees and exciting investors who were bedazzled by the limitless opportunities that seemed to exist in the cyberspace economy.

The Staples board believed that the creation of a tracking stock would highlight its internet efforts and provide Staples.com employees with options that linked their remuneration to the upside-potential of an "e-tailer." The tracking stock also provided the opportunity for Staples to raise venture capital specifically for Staples.com and the future chance to bring the Staples.com tracking stock to market in an initial public offering ("IPO").

The Staples board sought approval for the creation of the tracking stock at the company's November 1999 stockholders meeting via an amendment to the company's certificate of incorporation. The tracking stock proposal involved numerous complex elements, the most important of which follow:

- The tracking stock would be a new form of Staples common stock and would vote equally with the rest of Staples common stock.
- The existing Staples common stock became identified with the part of Staples known as "Staples RD", which stands for the "retail and delivery" sides of the business. The "Staples RD stock" was to reflect the performance of Staples' delivery operations (excluding e-commerce), stores, and catalog sales, as well as the value of Staples' retained interest in Staples.com.
- The Staples.com tracking stock was to reflect solely the performance of Staples.com. In the event that Staples were to decide to pay dividends—an eventuality the proxy said was unlikely—Staples.com tracking stock holders would have access to dividends based on what could be legally paid if Staples.com were a separate company.
- It was contemplated that Staples would, as noted above, keep a retained interest in Staples.com that would provide Staples RD holders with a large share of any benefits flowing from the success of the internet side of the business. This retained interest was to be set by the Staples board of directors before its initial issuance of Staples.com tracking shares. Upon the occurrence of certain events, the retained interest would automatically be adjusted by operation of the certificate of incorporation.
- Staples retained the authority to exchange Staples RD stock for the Staples.com tracking stock at a premium to fair market value that started at 25% and declined to 15% over a period set forth in the certificate (the "Repurchase Option").

Along with the certificate amendment, the Staples board asked the stockholders

to approve amendments to the company's compensation plans to permit the company to issue Staples.com shares and options under those plans. At the meeting, the Staples stockholders approved all the proposals related to the Staples.com tracking stock.

### B. *The Initial Shares Of Staples.com Are Issued*

The day of the November, 1999 stockholders' meeting, the Staples board also fixed the retained interest of Staples in Staples.com at 200,000,000 shares, and granted options for 28,303,304 shares to Staples directors and employees. Assuming the exercise of all such options, Staples' retained interest constituted 87.6% of Staples.com.

During the course of presenting the tracking stock proposal to the stockholders, the Staples board had already sought and secured outside investor participation from venture capitalists with internet savvy. It had hired Wit Capital to run an auction for venture capitalists who would have the opportunity to purchase Staples.com shares at $1.625 a piece and to serve on Staples.com's advisory board. General Atlantic Partners, L.P., Greylock IX Limited Partnership, Highland Capital Partners IV, and Summit Accelerator Founders Fund prevailed. The sale of nearly 5.9 million shares to these "Venture Capitalists" (in varying blocks) was made on the day of the stockholders' meeting.

The $1.625 sales price was also used as the price for the grant of immediately exercisable options to Staples managers and employees, and was deemed to be fair market value. Thirty-one of Staples' top

managers used $16.2 million in borrowed funds to acquire Staples.com stock through the exercise of these options. John Mahoney, Staples' CFO, was responsible for $1 million of this debt. Staples' CEO and Chairman, Thomas G. Stemberg,[1] and Staples' President and COO, Ronald L. Sargent, received 2,219,120 and 1,096,840 Staples.com options respectively, but did not incur debt to exercise them.

The $1.625 price was also used in a December 7, 1999 sale of 100,000 shares of Staples.com stock to each of Staples' directors. The sale transpired after the board learned that its director option plan was not commodious enough to permit the grant of options to that extent.

These various sales resulted in the managers and directors owning a solid majority of the issued Staples.com shares and options, with the directors alone owning over 26% as a group.

### C. *The Capital Stock Committee Is Formed*

The defendant directors emphasize that the decision to award options and shares in Staples.com stock to the Staples managers and directors had proper business purposes. Among other things, the board wished all Staples managers, including those who worked for Staples RD, to have a stake in the success of Staples.com. It was feared that unless this was so, Staples would not capture the full benefits of its multi-channel retailing strategy, which involved maximizing sales from its stores, catalogs, and the internet through efforts that were mutually reinforcing.

---

1. Stemberg is an investor in three of the participating venture capital funds, a fact that was not specifically told to the Staples board or stockholders until this year. Stemberg owns less than 1% of the total equity of two of those funds and slightly over 1% of the remaining fund. While these amounts do not seem material, the lack of earlier disclosure is, nonetheless, disquieting to the plaintiffs and arguably not in accordance with optimal standards of corporate governance.

Likewise, the defendant directors believed it to be important for the Staples board to have a stake in the success of Staples.com, especially because the directors (as a group) had a very significant equity stake in Staples RD stock. Because they would be making decisions that affected both classes of common stock, the board felt it was crucial that they also have an equity stake in both classes of stock.

In keeping with this concern, the board created a "Capital Stock Committee" or "CSC" of outside directors responsible for ensuring that the company appropriately balanced its responsibilities to both classes of common stockholders. Thus, the CSC was charged with overseeing the cash management and resource allocation policies between Staples and Staples.com, as well as addressing other issues that could generate a conflict between Staples and Staples.com.

Among the CSC's most important tasks was the implementation of a detailed cost allocation policy. Quite obviously, it made business sense for Staples as a whole to ensure that Staples.com could take advantage of Staples' established reputation, access to capital, and infrastructure. But it was also necessary—even taking into account Staples' retained interest—to ensure that Staples.com's performance was not subsidized by Staples RD in a manner that unfairly funneled wealth from Staples RD holders to Staples.com holders.

The CSC approved the accounting policies put in place to address this issue. These policies are complex and were the subject of negotiation and adjustment between Staples RD and Staples.com. The parties have not provided me with a basis to make any but the most general of observations regarding these policies.

My review of the record reveals that the policies allocate many direct costs to Staples.com on a basis that is a proxy for what it would have had to pay a third-party for those services, based on actual usage. But Staples.com also often receives a better deal on certain general and administrative costs, where it is only charged for any incremental costs to Staples RD on account of Staples.com's needs. Not only that, Staples.com had immediate, although not cost-free, access to the existing infrastructure of Staples, a huge advantage over a stand-alone, start-up e-tailer, which would have to finance the creation of that infrastructure itself. Similarly, the cost allocation formula did not charge Staples.com for intangibles, such as use of the Staples name and the cache of its reputation.

On the other hand, Staples.com did not charge Staples for many of its efforts that were likely to result in additional catalog and stores sales, or reduce Staples RD's costs. Rather, this intangible category was thought to be inherent in the Staples RD/ Staples.com structure and strategy, which was intended to maximize total sales from all outlets for Staples goods through mutually beneficial efforts by the traditional and e-tailing sides of the business.

Staples' auditors have reviewed the financial allocation methods governing Staples.com's use of Staples RD services and infrastructure, and found them to be reasonable. In addition, the approach that Staples has taken to accounting for Staples.com's use of Staples RD resources should not be surprising to Staples RD stockholders, because the approach seems in keeping with the approach outlined in the proxy statement issued in connection with the approval of the tracking stock.

Overall, it seems safe to say the following: Staples.com is allocated substantial charges for the Staples RD services it uses, nonetheless its overall costs of procuring the services it needs to deliver

products to its customers and administer its operations is more advantageous in the aggregate than if it operated outside of the Staples structure. Likewise, Staples RD derives certain efficiencies from its relationship with Staples.com, which bears the cost of web-related services that Staples RD in this era would undoubtedly have to bear if Staples.com had not been created. These realities make good sense, since the businesses are trying to maximize the returns that can be achieved by their synergistic efforts. As will be seen, however, these realities can be seen as complicating any effort to value the worth of Staples.com.

### D. The "Putative Reverse Stock Split"

In early 2000, the Staples board was anticipating an IPO of Staples.com stock. Its financial advisors suggested that a reduction in the number of Staples.com shares would improve the pricing of the IPO. Thus, the board decided to conduct a reverse split.

Because the Staples.com shares were entirely held by Staples itself, its directors and employees, and the Venture Capitalists, the board implemented the split through a series of discrete contracts in which holders exchanged two shares of Staples.com for one share. Each of the contracts was effective April 5, 2000 and by its terms provided: "On the Effective Date, the Number of Shares Issuable with respect to Staples Retail and Delivery's Retained Interest in Staples.com (defined in Staples' certificate of incorporation) shall by reduced by dividing the current number by two." [2]

The Staples board did not seek or obtain a certificate amendment to effect the re-

verse split. Rather, it contends that the effect of the contracts was to effect a split, resulting in an automatic adjustment of Staples RD's retained interest, pursuant to Article IV.A.6(a) of the certificate of incorporation. The plaintiffs take a different view of the matter.

In any case, the reader should recognize that the split had the putative effect of doubling the per share price of Staples.com shares. Thus, the original pre-split investment price of $1.625 is hereinafter referred to in post-split terms as $3.25, and all other price references are in post-split amounts.

### E. The Technology Market Crash Scotches Plans For A Staples.com IPO

By the spring of 2000, Staples' prospects for a lucrative Staples.com IPO were largely dashed, as a chastened and tired marketplace began to view e-commerce IPOs with a more traditionally conservative investment eye. While Staples' financial advisors believed that Staples.com could have gone public, they advised that the pricing of the initial offering would be less favorable than Staples management had wished.[3] As a result, Staples management began to consider other alternatives, while keeping an IPO alive as an option if market conditions changed.

### F. The Performance Of Staples.com As Of Mid–2000

The parties hotly contest whether Staples.com has performed well or poorly, as of any date. For now, I focus on mid-year 2000.

For their part, the defendants note that Staples.com had by then grown its sales at

---

**2.** PX 45.

**3.** Stemberg Dep. at 60 (Stemberg says that the bankers were suggesting that the IPO

could be done at $7 per share and that he found this price "unattractive").

an impressive clip and that it had garnered awards for the quality of its web site. For example, the defendants cite to the fact that Staples.com sales grew from $16.9 million in fiscal year ("FY") 1998 to $94.3 in FY 1999. By March 2000, Staples.com internally forecasted revenue of $335 million for FY 2000.

The plaintiffs, of course, emphasize that this sales growth was coupled with significant operating losses. For example, at the same time that Staples increased its Staples.com revenues estimate for FY 2000 in March of 2000, Staples also increased its estimated Staples.com loss from $75 million to $150 million. Staples management represented to the SEC through counsel that this development had triggered a sharp market decline in the trading price of Staples RD stock.[4]

The plaintiffs also note that Staples infused $100 million in new capital in Staples.com in 2000 in exchange for an increase in its retained interest. These infusions were made at prices ranging from $5.32 per share to $6.67 per share.[5] Over four million of the new Staples.com shares Staples obtained were purchased after the Venture Capitalists on Staples.com's advisory board declined a June, 2000 invitation to buy additional shares and maintain their same proportionate interest.[6]

### G. Staples Begins To Develop A Concrete Alternative To A Staples.com IPO

By autumn 2000, Staples faced a practical dilemma. It had led its employees to believe that an IPO for Staples.com would occur in the year 2000. Many of its top managers had purchased their Staples.com shares with borrowed money and had no way to realize a return on the shares that would service this debt and enable them to take a profit. At the same time, the stock market was relatively inhospitable to IPOs.

In response, Staples management began considering alternatives to an IPO. These included making a partial tender for Staples.com shares that would provide some needed liquidity and debt relief to employee-holders, buying time for a later IPO. In October 2000, Staples management held a corporate "town meeting" with Staples.com employees to discuss these options. The meeting materials suggest a partial tender offer in May 2001 at between $6–$8 per share was contemplated as a method of addressing employee concerns.[7] Management provided employees with a sketch of its plans, and suggestions for how employees who had not yet exercised their options could do so and thus participate in the tender offer.

By that time, it also seems apparent that Staples management was also beginning to consider the option of folding Staples.com back into Staples, and eliminating the Staples.com shares as a separate class of stock. And, in December, Staples management took a step that can be viewed as a step toward a total fold-back.

On December 13, 2000 Staples management made a presentation to the Venture Capitalists about the prospects of Staples.com as a prelude to offering to purchase back a significant percentage of their Staples.com shares. This overture came at a time when many venture capital funds were struggling with losses from a sharp downturn in the stock market and

---

**4.** PX 18.

**5.** PX 37.

**6.** PX 149.

**7.** PX 103.

might have found it attractive to sell a stock for a gain.

Staples' CFO John Mahoney presented financial models about Staples.com that had a wide-range of values for the business. Mahoney's presentation, however, focussed the Venture Capitalists on values that would imply a price of between $6.50 and $7.00 per Staples.com share.[8] Some of the Venture Capitalists apparently felt that this price range was too low, because they believed that Staples.com was performing well.

After a short caucus, however, the Venture Capitalists offered to sell 50% of their Staples.com holdings for $6.50 a share. This would permit them to get back their purchase price for their initial stake, while retaining an upside stake in Staples.com's potential with the 50% they retained. Shortly after the meeting, Mahoney contacted the Venture Capitalists and asked them if they would sell 65% of their shares for $6.10 a share. This would enable the Venture Capitalists to get their original purchase price back. The Venture Capitalists all accepted and the sale was consummated in January 2001.

While the $6.10 price was lower than the Venture Capitalists had originally offered, the plaintiffs note that it was still higher than the $5.60 fair market value the Staples board had put on the Staples.com stock in early December 2000 for the purpose of granting options and pricing capital infusions in Staples.com by Staples.[9] The plaintiffs contend that Stemberg and Mahoney did not bargain with the Venture Capitalists for the lower $5.60 price because they wanted to set a floor for the yet-to-be unveiled plan to buy back all of the Staples.com stock (including their own substantial positions) at a healthy price.

### H. Staples.com's Sales Growth Exceeds Expectations For FY 2000

When its fiscal year 2000 closed on February 3, 2001, Staples.com had sales of $512 million, which exceeded its March 2000 estimate of $335 million by 52.83%. This sales figures quintupled the FY 1999 results. Meanwhile, its FY 2000 losses turned out to be $95 million, well below the $150 million that had been projected. For FY 2001, Staples.com was projecting sales of over $900 million and becoming profitable in the last quarter.

### I. Staples Informs The United Kingdom Tax Authorities Of Its View Of The Fair Market Value of Staples.com Shares

In February, Staples—through its counsel, Baker & McKenzie—communicated with the English taxing authorities regarding the fair market value of Staples.com shares. It stated that it did so because English employees would likely exercise Staples.com options beginning in March and that this would have tax implications. This signal was consistent with earlier indications that Staples management would propose a significant transaction in the spring of 2001 to repurchase at least some of the Staples.com shares that employees had bought with exercised options.

In their first communication to the tax authorities dated February 14, 2001, Baker & McKenzie represented that the best evidence of the fair market value of Staples.com shares was the $5.60 price set by the board in December. Eight days later, the firm revised its communication, indicating:

1. On 12 January 2001 Staples, Inc. purchased 3,832,500 shares of Staples.com stock held by venture capital investors. This stock was pur-

---

8. Stemberg Dep. at 68.

9. PX 29.

chased at a price of $6.10 per share. There was very little negotiation in relation to the price. The issue was briefly discussed at high levels within the company. The company offered $6.10 per share and the offer was immediately accepted. Staples, Inc.'s Legal Counsel has confirmed that there have been no further transactions in Staples.com stock since 12 January 2001.

2. In determining the value of Staples.com stock, the Board of Staples, Inc. has not determined the value in a formulaic way. It has mainly considered the performance of the Staples.com business unit, which has continued to improve quarter over quarter. Sales are increasing and costs to break-even point are decreasing. No formal valuations have been sought from third parties, although the $6.10 price agreed by the venture capital investors should be indicative of the true value, as it was struck with third parties in an arms' length transaction.

3. There has been a recent change in the nature of the Staples.com business, as that business has been rolled into the Staples Direct catalogue business. This made business sense because both parts of the group had used the same back-end fulfilment [sic] function. Our clients do not consider that this has resulted in a higher value for the stock, however, but is indicative of the continuing growth of the business.[10]

The last paragraph of this communication is significant in itself, because it noted the fact that Staples had already begun to blend Staples.com into the Staples RD op-

eration. This blending was reflected in the fact that Stemberg put Lewis in charge of both Staples.com and the delivery aspects of Staples RD's business.[11]

### J. Staples Management Commits Itself To Eliminating The Staples.com Tracking Stock and Folding Staples.com Back Into Staples

On February 23, 2001, Staples management held another town meeting with employees. For the first time, management presented the option of eliminating the tracking stock through a Reclassification and folding Staples.com back into Staples. It also presented a much more pessimistic view of the prospects for an IPO—noting that there was "no guarantee that the IPO may ever happen"—and signaled that the elimination of the tracking stock altogether presented a better option for short-term liquidity.[12] The presentation outlined a scenario at which shares of Staples.com stock would be exchanged for Staples RD stock in a deal that valued the Staples.com shares at between $6.50 and $7.50 a piece. The fold-back option won the day.

### K. The Fold–Back Option Is Presented To The Staples Board

After Staples' top management had already largely committed themselves to the fold-back, they presented the fold-back formally to the CSC on March 5, 2001. Stemberg presented the proposal to the CSC without a price attached, and solely based on the business logic of the move, which was summarized in the committee minutes as follows:

Mr. Stemberg then commented on the reasons for making the proposal. He said that it has become increasingly evident that Staples customers are custom-

---

10. PX 30.

11. PX 1, at 6–7.

12. PX 27.

ers of all Staples channels and that the lifetime value of the customer increases significantly as it purchases through more channels. It has thus become critical to align incentives so that all channels share customers and are consistently rewarded for supporting the customer's ability to buy from Staples through as many channels as it wants. He cited as an example the recent combination of Direct with Staples.com, and stated that the synergies and benefits for the customer and for Staples to be realized from the combination are significant. He said that he believes that it is important for the financial structure of the Company to support this operational model.

Mr. Stemberg also said that the illiquidity of the Staples.com Stock was becoming a disincentive for Staples.com associates. One of the principal reasons for adopting the tracking stock at the outset was to create an equity incentive to attract technology/internet experienced individuals to Staples. With no plan to provide liquidity for the Staples.com stock in the immediate future, the Staples.com stock options have lost their value to attract new associates and, for those who have already exercised options, the lack of liquidity has become a disincentive.

Mr. Stemberg then noted that the Company already has the right to exchange Staples Stock for Staples.com Stock without a shareholder vote, but subject to paying a significant premium for the Staples.com shares. He said that ex-

changing the Staples.com shares at such a premium would result in unfavorable accounting consequences for Staples.[13]

Following Stemberg's presentation, the CSC unanimously agreed to support his recommendation. The committee also ruled the Repurchase Option out on Stemberg's advice, on both the grounds stated. The second ground is somewhat complicated and warrants some explanation. If the company paid a premium for the Staples.com shares that had been purchased through the exercise of options by employees, it was believed that those options would be treated as "variable" and be given different accounting treatment that could trigger income statement adjustments that could adversely affect Staples RD's paper profits.[14]

Staples' management did not quantify the amount of such effect. Likewise, the Staples board did not consider the price at which it could redeem the Staples.com shares by exercise of the Repurchase Option in order to assess whether that price was so attractive as to outweigh any negative accounting consequences.

Later that day, the full Staples board gave its approval to the Reclassification. The board also authorized the CSC to fix the price of the transaction, and to retain two investment banks to give fairness opinions. One bank would opine as to fairness from the perspective of the Staples.com holders; the other would decide if the price was fair to Staples as a company.[15]

---

13. DX 9.

14. Without dilating on this point, it bears noting that options with the same actual economic effect on a company can have very different income statement consequences, because they trigger different methods of accounting. By redeeming the Staples.com shares through the payment of a premium,

the Staples board feared that they would have to account on their income statement sheet for an economic reality that could otherwise be kept from affecting recorded profits and losses.

15. PX 35. In a snafu, the directors were each awarded additional Staples.com options on March 5, 2001 at $6.10 a share. Although the

On March 8, 2001, the CSC reconvened to consider the price Staples would offer the Staples.com stockholders in order to induce their agreement to exchange their shares for Staples RD shares. Although the CSC approved the hiring of Wit SoundView to give a fairness opinion from the Staples.com perspective, and Thomas Weisel Partners to do the same for Staples, it did not defer its decision to set the deal price until it could receive input from the outside bankers.

Instead, the CSC set the exchange price itself at $7 per Staples.com share. The CSC acted after receiving a detailed valuation report from Staples' CFO, Mahoney, who had borrowed $1 million to purchase his Staples.com shares. Mahoney's presentation consisted primarily of a discounted cash flow analysis, which yielded a range of valuations of between $5.26 and $9.42 per Staples.com share. The DCF model that Mahoney used assumed that Staples.com sales would increase to over $950 million in FY 2001, and grow to over $2.2 billion by FY 2005. Mahoney's valuations did not include any private market discounts, tracking stock discounts, or the anticipation of any future rounds of financings of Staples.com.

According to CSC member Basil Anderson—who has over 20 years of experience as a CFO of two major public companies—the committee selected $7 per share as a conservative number. Anderson notes that this figure was in the lower part of the range that Mahoney presented, and reflected a DCF valuation based on healthy discount rate of 20–25%. In addition, Anderson noted that Staples.com sales and costs had consistently

outperformed management's estimates. At $7 a share, the selected figure valued all of Staples.com's equity at approximately $909 million.

At the same meeting, the CSC also set the price for the Staples RD stock to be issued in the exchange. That price was to be based on a twenty-day average of stock market trading prices for Staples RD shares.

After the March 8 meeting, Wit SoundView and Thomas Weisel went to work on their assignments. Wit SoundView originally believed its job to be to determine the fairness of the $7 per share price in comparison to the "fair market value" of the Staple.com shares.[16] For some as yet unexplained reason, Wit SoundView then elected not to use fair market value as its benchmark.

For a bank hired to determine whether the $7 per share price for the Staples.com stock was fair to the holders of that stock, Wit SoundView also harbored a concern that was odd: it was worried that the price was overly generous to those holders. Just three days before issuing their fairness opinion, Wit SoundView's principals on the transaction exchanged e-mails evincing their concern that the $7 price was unjustifiably high. Vito Sperduto initiated the exchange on March 11 by writing to his superior, Mack Rossoff, stating:

> Just got off the call with the Staples.com CFO ... the information is very light ... the projections are very aggressive ...
>
> The board is recommending a price of $7.00 per share ($875 million) and the original investment was made at $3.25 per share ($406 million) in November

plaintiffs contend that this was an attempt by the directors to stock their larders, it appears more likely that these grants were generated by automatic operation of Staples' director compensation program.

**16.** PX 111 (draft fairness opinion containing FMV definition); PX 108 (final fairness opinion omitting reference to FMV).

1999. I realize the business has gone from $94 million in 1999 to $521 in 2000, but it might be difficult to justify that price jump.

Just want to give you a heads-up prior to our discussion later today.[17] Sperduto sent Rossoff an e-mail the next day that said:

> The other way to look at it is based on Staples forward P/E multiple of 22x 2001 net income. If I apply that multiple to the projected staples.com net income in 2005 and discount it back to present at 30% discount rate then I get a value of approx. $7 per share. Leap of faith is that the $107 million net income number is believable—right now I think the projections are too aggressive.[18]

Rossoff replied that Staples did not trade on a revenues multiple. Sperduto answered with this reply:

> On SPLS ... we have a fairness committee mtg scheduled for Wednesday at 10:AM. They want us to present to the capital committee of the BOD on Thursday at 3:PM.
>
> We are going through the numbers ... it is going to be hard to get to the $7 per share level. The only way that I can get close is to value the staples.com biz based on the amount of contribution to revenue of the combined company. SPLS is currently trading at $7.8 billion. S.com revenues were 4.8% of total revenues in 2000 and are projected at 8.1% and 9.6% in 2001 and 2002, respectively. At 8% to 9.5% of the total valuation, the implied valuation is $5 to $6 per share.[19]

By March 14, Sperduto's assistant, Angel Fierro, informed him that the Wit SoundView team was about ready to send him the board book, and "just want to be sure the figures all foot. Oh, and the numbers came up so our ranges are in positive territory versus the $7."[20]

The next day Wit SoundView delivered its presentation to the CSC. It based its fairness opinion on DCF and comparable companies analyses, as well as comparisons to arguably analogous transactions. Its analyses generated a range of values that enabled Wit SoundView to conclude that the $7.00 per share price was fair to the Staples.com stockholders.

### L. The CSC And The Full Board Receive The Fairness Opinions And Ratify The $7 Price

On March 15, the CSC met and considered the views of Thomas Weisel and Wit SoundView. Thomas Weisel reported first and opined that the $7 price was in the lower end of value implied by their valuation exercises, which were similar to those used by Wit SoundView. It indicated that a DCF using management's projections yielded a mean value of $1.2 billion for Staples.com, and that this valuation had been tested by use of a more pessimistic set of assumptions that yielded values of $800 to $900 million. Thomas Weisel indicated that its other valuation techniques also supported the fairness of the $7 per share (or $909 million in implied total equity) price, and that it could therefore opine that the price was fair to Staples RD.

The Thomas Weisel representatives then withdrew from the meeting, and Wit SoundView presented its analysis, which focussed on a DCF analysis with a range of $5.15 to $8.98 per share, and a comparable companies analysis with a range of $4.77 to $9.53 a share. Thereafter, the

17. PX 129.

18. PX 130.

19. PX 130.

20. PX 131.

CSC voted unanimously to approve an exchange of Staples.com for Staples RD stock based on a $7 price for the Staples.com shares and the twenty day average stock market price for Staples RD shares, which was $15.93 per share. The full board then convened, heard a summary of the bankers' opinions and methodology, and voted to proceed at the $7 Staples.com price.

Neither the CSC nor the full board considered whether the valuations presented should be adjusted because of factors such as: (i) lack of marketability; (ii) the Staples.com shares' status as tracking stock; (iii) the Staples.com holders' ownership of less than 10% of the total equity of that business; or (iv) the propriety of valuing Staples.com as if it were a stand-alone without adjustment for any possible subsidization of its operations from Staples RD.

### M. The Personal Interests Of The Staples Directors In The Reclassification

As noted earlier, when the Staples.com tracking stock was created, the Staples board had believed it to be important for it and top Staples management to have an equity stake that gave them an incentive to make Staples.com succeed. The plaintiffs' more cynical take is that the Staples board and management wanted a large stake in an internet tracking stock that they hoped to take public at an attractive premium to their initial investment price.

Whatever their original motivation, the Staples board owned Staples.com shares that they had purchased at $3.25 a share, and some owned a few additional options exercisable at prices less than $7 per share. As a result, the $7 offer would guarantee that the directors made overall premium of around 115% and were relieved of any possible risk that might be associated with the future of Staples.com. The $7 offer also ensured that the top managers of Staples who had gone into hock to buy Staples.com shares (*none of whom were on the board*) could pay off their debts and retain a healthy profit.

These benefits cannot be viewed in isolation, however, because these same directors and managers also had a substantial stake in Staples RD. Thus if the sale was overly disadvantageous to Staples RD, their gain on the Staples.com side of the equation would be off-set to some extent by the adverse effect the deal had on the value of their Staples RD holdings and any incentives they possessed based on the performance of Staples RD. As a group, the directors of Staples had these relative holdings as of February 26, 2001:

| Directors | Staples RD Stock | Value Based on Exchange Price of $15.925 | Staples.com Stock | Value Based on Exchange Price of $7.00 |
|---|---|---|---|---|
| Thomas G. Stemberg | 7,489,775 | $119,274,666.88 | 1,129,120 | $ 7,903,840.00 |
| Martin Trust | 2,778,032 | $ 44,240,159.60 | 53,250 | $ 372,750.00 |
| Ronald L. Sargent | 1,269,433 | $ 20,215,720.53 | 596,840 | $ 4,177,880.00 |
| Robert C. Nakasone | 514,649 | $ 8,195,785.33 | 53,250 | $ 372,750.00 |
| Rowland T. Moriarty | 379,513 | $ 6,043,744.53 | 53,250 | $ 372,750.00 |
| Mary Elizabeth Burton | 209,907 | $ 3,342,768.98 | 53,250 | $ 372,750.00 |
| Paul F. Walsh | 133,245 | $ 2,121,926.63 | 53,250 | $ 372,750.00 |
| James L. Moody, Jr. | 96,855 | $ 1,542,415.88 | 52,600 | $ 368,200.00 |
| W. Lawrence Heisey | 89,657 | $ 1,427,787.73 | 53,250 | $ 372,750.00 |
| W. Mitt Romney | 79,477 | $ 1,265,671.23 | 52,600 | $ 368,200.00 |
| Basil L. Anderson | 50,200 | $ 799,435.00 | 53,250 | $ 372,750.00 |
| George J. Mitchell | 21,435 | $ 341,352.38 | 52,600 | $ 368,200.00 |
| Margaret C. Whitman | 18,891 | $ 300,839.18 | 51,950 | $ 363,650.00 |
| **Total** | 13,131,069 | $209,112,273.83 | 2,308,460 | $16,159,220.00 |

As can be seen, the Staples RD holdings of the Staples directors far exceeded their Staples.com holdings. Nonetheless, the Staples directors—particularly the two management-directors, Stemberg and Sargent—stood to make a tidy sum off their Staples.com holdings in the Reclassification.

### N. *The Announcement Of The Reclassification Generates Lawsuits And Criticism*

When the Reclassification was announced, lawsuits were filed contending that the Reclassification unfairly lined the pockets of the directors and top managers of Staples at the expense of Staples RD stockholders. The tenor of the suits and the media criticism was that the Staples.com venture was a bust that should not have been undertaken in the first place. Having failed to make it work, the Staples directors and managers were allegedly attempting to reap a windfall from a financial mistake that had already depressed the price of the Staples RD stock.

Stung by this criticism, the Staples board reconvened on March 29, 2001 and April 1, 2001 to consider two options: rescinding the Reclassification proposal altogether or simply rescinding the board's own participation. The board did act to rescind its own participation so as to minimize any perception that the board was acting to advance its own personal interests. To accomplish this, the board resolved to repurchase all of the directors' Staples.com stock at the purchase price, without interest. The board also cancelled all of its Staples.com options for no consideration. As a result, the board members will not profit from the Reclassification at all, and will suffer an actual economic loss from their investment in Staples.com because they will have lost the time value of the money paid to purchase their shares.

But the board concluded that it was inadvisable to rescind the Reclassification proposal in totality because they believed that the Reclassification was beneficial to Staples.

### II. *The Preliminary Injunction Standard*

■ To earn a preliminary injunction against the Reclassification, the plaintiffs must demonstrate a reasonable probability of success on the merits, that irreparable harm will occur in the absence of an injunction, and that the balance of the hardship tips in favor of an injunction.[21]

### III. *The Plaintiffs' Arguments*

The plaintiffs have peppered the defendants and the court with an array of challenges to the Reclassification. As an overall matter, the plaintiffs contend that the Reclassification was conceived as a way of bailing out the top management of Staples for their imprudent decision to launch the Staples.com tracking stock. Having had their hopes of becoming exceedingly wealthy from the e-commerce boom dashed, the top management supposedly contrived the Reclassification to hold themselves and their subordinates harmless at the expense of the Staples RD stockholders.

The plaintiffs proceed from this premise to the contention that the Reclassification is subject to the entire fairness standard form of review because the Staples directors were "interested" in the transaction because they owned shares in Staples.com. The fact that the directors rescinded their own participation cannot, the plaintiffs say, erase the taint of their

---

21. *E.g., Thompson v. Enstar Corp.,* Del.Ch., 509 A.2d 578, 580–81 (1984).

earlier interest, which existed at the time the $7 price was set.

The plaintiffs therefore seek a preliminary injunction against the Reclassification on the grounds that the transaction is likely to be found unfair after trial and will give rise to irreparable harm if not enjoined. In the alternative, the plaintiffs contend that the proxy statement issued in connection with the Reclassification is materially misleading and that an injunction should issue requiring corrective disclosures.

Next, the plaintiffs argue that the Reclassification is tainted by the purported reverse split. According to plaintiffs, the reverse split was improperly conducted and could not operate to reduce Staples' retained interest. Finally, the plaintiffs say that the Staples board failed to set a proper record date.

I will now address the merits these arguments in the order just outlined.

### IV. The Merits Of Plaintiffs' Claims

#### A. Because The Staples RD Stockholders Will Have The Opportunity To Decide Whether The Reclassification Should Proceed Based On A Uncoerced And Informed Vote, The Court Will Not Issue An Injunction On Pure "Fairness" Grounds

■ The first contention of the plaintiffs is perhaps the easiest to resolve. The plaintiffs would have the court decide that it is reasonably likely that the Reclassification will be found "unfair" to the Staples RD holders at trial and to issue a preliminary injunction on that basis. There are several problems with this line of argument.

■ Initially, I note that I am uncertain that the plaintiffs would be able to show after trial that a majority of the Staples board suffered from the sort of disabling self-interest that would invoke the entire fairness standard. The Staples.com stock that the directors held was, after all, a class of Staples common stock. Delaware case law has recognized that there will be circumstances when corporate directors must balance the competing interests of two classes of their company's stock. When this sort of inevitable balancing by corporate fiduciaries occurs, the entire fairness standard is not automatically invoked.[22] Otherwise, corporate boards might be paralyzed by fear at falling off the legal tightrope that they would have to cross to make such decisions. Such a rule would also discourage directors from owning all classes of their corporations' shares, and thus be of dubious utility in terms of aligning the interests of directors and stockholders.

In two recent cases, this court has held that this traditional approach also applies when directors have to balance the interests of stockholders who hold traditional common stock and stockholders who hold a common stock that "tracks" a particular aspect of the corporation's business. As a result, to "show that a ... [Staples] director's independence was compromised ..., plaintiffs must [prove] the amount of [the director's holdings in Staples.com] and the predominance of such holdings over [Staples RD] holdings was of sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the [Staples RD] shareholders ...."[23]

22. Gilbert v. El Paso Co., Del.Supr., 575 A.2d 1131, 1147–48 (1990); Jedwab v. MGM Grand Hotels, Inc., Del. Ch., 509 A.2d 584, 595 (1986); Freedman v. Restaurant Assocs. In-

dus., Inc., Del.Ch., 1987 WL 14323, at *10, Allen, C. (Oct. 16, 1987).

23. In re General Motors Class H Shareholders Litig. ("GMH"), Del.Ch., 734 A.2d 611, 617

In this case, it appears that the Staples' directors, as a thirteen-member group, had a much more significant interest in the long-term success of Staples RD than in reaping a one-time windfall from their Staples.com shares. It is true Stemberg and Sargent had hefty amounts of Staples.com options, which could compromise their objectivity irrespective of their much larger Staples RD holdings. But the other eleven Staples directors stood to make a one-time profit of only around $187,500 a head if they sold at $7 per share.[24] While this is not a trifle, the outside directors are persons of means and reputation, and the plaintiffs have not demonstrated that the prospects of a one-time gain of this sort would be a material consideration to most, if any, of them. Therefore, the record does not allow me confidently to infer that the directors' holdings of Staples.com stock were "so substantial as to have rendered it improbable that [the board] could discharge their fiduciary obligations in an even-handed manner."[25]

The plaintiffs argue that this case presents a somewhat distinct problem from previous cases, however, because the Staples.com stock was held by only the directors, managers, and Venture Capitalists. The Staples RD holders only possessed a stake in Staples.com through Staples' retained interest, and therefore did not stand to gain from any buy-out of the Staples.com shares. Because the Staples.com stock was not widely held by public stockholders, the plaintiffs contend that the Staples directors' ownership interests in that stock—which comprised over 26% of that stock, excluding Staples' retained interest—pose more troubling issues than the typical case in which directors must balance the interests of two

classes of company stock, each broadly held by the public. In more typical circumstances, it is necessary for the directors to balance the interests of two public classes of stockholders, but the directors will not control a very large percentage of one class and a quite small percentage of the other. In that circumstance, it is much harder for the directors to reap a windfall from their holdings of one class, without having that windfall washed out by a corresponding adverse effect on their shares of the other class. Here, plaintiffs contend, the Staples board is actually balancing the interests of its public stockholders against the interests of an elite class of Staples.com stockholders dominated by management-holders. Over 26% of any windfall on the Staples.com stock would have been spread directly to the directors, while the cost to the Staples RD shares would be spread over *all* the Staples RD shares, of which less than 3% were owned by the directors.

There is strong logical force behind this argument. Yet, I remain unpersuaded of it at this stage, in the absence of a stronger showing that the gain that the Staples outside directors stood to achieve by implementing the Reclassification in a manner unduly favorable to the Staples.com holders was material enough to them to compromise the integrity of their decision-making.

Moreover, this analysis ignores the board's decision to rescind its own participation in the Reclassification and its vote to proceed with the Reclassification at a time when its own self-interest was seemingly minimal. Although the plaintiffs argue that the reaffirmation vote was tainted

(1999); *see also Solomon v. Armstrong,* 747 A.2d 1098, 1118 (1999).

24. Plaintiffs' Br. at 37.

25. *GMH,* 734 A.2d at 618.

because of the defendants' fear of liability, I am not persuaded that this argument will likely prevail after a full inquiry.[26]

Even more important, I would not be inclined to take the power to decide whether to proceed with the Reclassification out of the Staples RD stockholders' hands, even if the board did suffer from a conflict. The entire fairness standard contemplates judicial review of the substantive fairness of a corporate transaction only as a last resort method of protecting stockholders from self-dealing transactions. When a board uses sufficient procedural protections—such as independent director approval or a stockholder vote—judicial review of the fairness of an "interested" transaction may, as a general matter, be obviated. Here, a separate vote of the Staples RD stockholders is necessary to effect the Reclassification. That vote will not be controlled by Staples management. To the contrary, the Staples RD electorate is dominated by sophisticated institutional investors well-positioned to vote in an informed manner that reflects a full appreciation of the strategic and financial posture of Staples, assuming adequate disclosures.

In circumstances like these, this court has been rightly reluctant to interpose its own view of the business merits, thereby precluding an opportunity for the genuine stakeholders to make their own decision.[27] Judicial intervention of that sort would preempt the electorate's ability to ratify the transaction, and substitute necessarily imprecise after-the-fact fairness review for the before-the-fact judgment of sophisticated investors. While there may be circumstances when an injunction should issue to stop an uncoerced stockholder vote, those circumstances do not exist in this case.

The record does not persuade me that the Staples board likely approved the Reclassification in bad faith or that its deliberations were so careless as to be labeled grossly negligent. In this regard, it is worth noting that the Reclassification is premised on quite plausible reasoning. Having determined that its e-commerce operations are in fact an integral part of a mutually reinforcing multi-channel retail sales business, Staples management has recognized that it makes little sense to maintain artificial barriers between Staples.com and Staples RD, when they are in fact parts of one integrated business. These barriers require complicated accounting and cost-allocation procedures without corresponding economic benefits, now that a seemingly more rationalized stock market has begun to focus again on traditional values like earnings. Because the market is not ready to welcome a Staples.com IPO at an "irrationally exuberant" price, the decision to fold Staples.com back into the Staples RD family and eliminate the tracking stock is one

---

**26.** I also find unpersuasive the plaintiffs' argument that the Reclassification vote must be enjoined because the Reclassification cannot be separated from the transaction in which the directors sold their shares back to Staples at cost and rescinded their options without consideration. The transaction involving the directors is complete and cannot be undone by a preliminary injunction. *See In re Digex, Inc. Shareholders Litig.*, Del.Ch., C.A. No. 18336, 2000 WL 1847679, at *32, Chandler, C. (Dec. 13, 2000). The Reclassification's approval or non-approval by the Staples stock-

holders will not affect that prior transaction one way or the other, and the plaintiffs are free to challenge that transaction's fairness regardless of the outcome of the vote.

**27.** *State of Wisconsin Inv. Bd. v. Bartlett*, Del. Ch., C.A. No. 17727, 2000 WL 238026, mem. op. at 27–28, Steele, V.C. (Feb. 24, 2000); *In re IXC Communications, Inc. Shareholders Litig.*, Del.Ch., C.A. No. 17334, mem. op. at 16–20, 1999 WL 1009174, Steele, V.C. (Oct. 27, 1999).

logical approach to the situation Staples faces.

Logical too is the desire of the Staples board to make an exchange offer that is enticing to the Staples.com stockholders. Presumably, Staples has an interest in ensuring that its employees and managers who bought Staples.com stock and received Staples.com options feel that they have been fairly treated. One of the ideas behind the creation of the tracking stock was to retain employees who might otherwise have fled for other e-commerce activities. These employees were led to believe there would be an IPO. Offering them an attractive price leaves them with a feeling that Staples has a regard for their interest. A similar, if somewhat weaker, rationale also exists as to the Venture Capitalists, with whom Staples may wish to retain a strong relationship as a way of retaining access to future capital. These considerations are made stronger by the reality that the Reclassification requires the assent of a majority of the Staples.com holders.

Furthermore, the board's decision to pay $7 per share must be considered in scale. Staples has a total market capitalization of approximately $7.25 *billion*. To cash out the remaining Staples.com stockholders and option holders will cost it a maximum of $103 *million*.[28] Even the plaintiffs must admit that the Staples.com stock is worth something.[29] If the $7 per share price is inflated by even $1.80—a full 90 cents less than was paid to the Venture Capitalists in January—the total overpayment will equal approximately $25.8 million, a number that is inflated by the fact

that 30% of that total would include restricted shares issued to Staples employees that will not vest for two and a half years. Rational investors may think any overpayment of this amount worth the candle to allow Staples to move forward in an integrated manner without two classes of stock and without losing the trust of its employees and the Venture Capitalists.

Of course, I cannot deny that the plaintiffs advance a number of potent arguments to support the view that the Reclassification is imprudent and unfair, many of which are suggested by the preceding factual recitation. But, my decision does not credit the defendants' proffered view that the Reclassification is a sound transaction for Staples RD holders. Rather, my point is that self-interested Staples RD stockholders could find it beneficial to approve the transaction. Given that reality, the judicial role is most appropriately focused on ensuring that they have been given the information necessary to enable them to cast their vote in an informed manner.

To that task, I now turn.

**B.** *Does The Proxy Statement Fairly Disclose All Material Facts?*

■ The basic legal standard applicable to this aspect of plaintiffs' motion is well-established and deceptively easy to state: the defendant directors have the duty to disclose in a non-misleading manner all material facts bearing on the decision of the Staples RD and Staples.com stockholders' whether to approve the Reclassifica-

---

28. This is based on the total number of outstanding Staples.com stock as of May 2, 2001, and the number of unexercised options. *See* Proxy at 1; Mahoney Aff. ¶ 33. The option cost calculation is aggressive because it assumes all options were exercisable at a price of only $3.25.

29. Puglisi Aff. at 16 (plaintiffs' expert suggests a fair market value range of $4.72 to $5.59 per Staples.com share).

tion.[30] The directors must also avoid partial disclosures that create a materially misleading impression.[31] In a recent case involving a decision by stockholders whether to accept merger consideration or seek appraisal, our Supreme Court held that these disclosure duties required the directors to "be given financial information about the company" that was material to that decision.[32] But this duty did not require the directors to provide financial information that was merely "helpful" or cumulative to other information that was provided, and the duty did not extend to the provision of information to permit stockholders to make "an independent determination of fair value." [33]

The Supreme Court's holding was in keeping with prior Delaware decisions, most of which have involved careful, if admittedly unscientific, examinations of disclosures to determine whether information that plaintiffs claimed was omitted or misleadingly described was sufficiently important to merit additional or corrective disclosures. Always at the forefront of the thinking behind these cases has been the need to avoid rules of disclosure that simply inflate the already-weighty proxy statements that stockholders receive, while at the same time encouraging the disclosure of genuinely useful decisionmaking information.

In the area of investment bankers' fairness opinions, the cases also display a certain modesty that recognizes the natural limits of the common law decisionmaking process. That process is ill-suited to the rational articulation of broad disclosure principles that adequately consider all the competing values at stake. That is the reason that the Securities and Exchange Commission's rulemaking process is so vital to the integrity of fair disclosure in the American system of corporate governance.

With these preliminary thoughts in mind, I turn to the specific disclosure deficiencies claimed by the plaintiffs.

1. *Does The Proxy Statement's Failure To State What Value Measure The Staples Board Used In Valuing The Staples.com Stock Render It Materially Misleading?*

■ The plaintiffs contend that the proxy statement is materially misleading because it does not indicate the precise definition of value that was used by the Staples board in determining how to set the $7 per share price. By contrast, the proxy statement expressly refers to the fact that the Staples.com shares could be exchanged for Staples RD shares, which were based on a *"fair market value"* as determined by the stock market average price for those shares.[34] The plaintiffs imply that the Staples RD voters will somehow think that the Staples.com shares were valued by the board and the bankers on a fair market value standard that takes into account factors such as lack of marketability.

Upon initial consideration of this issue, I was inclined to agree with the defendants that this danger is not material. After all, the proxy statement expressly states that

**30.** *See, e.g., Malone v. Brincat,* Del.Supr., 722 A.2d 5, 10 (1998); *Skeen v. Jo–Ann Stores, Inc.,* Del.Supr., 750 A.2d 1170, 1174 (2000); *McMullin v. Beran,* Del.Supr., 765 A.2d 910, 925 (2000).

**31.** *Arnold v. Society For Savings Bancorp, Inc.,* Del.Supr., 650 A.2d 1270, 1281–82 (1994).

**32.** *Skeen,* 750 A.2d at 1174.

**33.** *Id.*

**34.** Proxy at 6 (emphasis added).

the management analyses reviewed by the CSC in determining the $7 per share price "did not reflect any private market discounts, tracking stock discounts, or future financing."[35]

A close reading of the proxy statement, however, convinces me that this one-line qualifier is not sufficient. The Reclassification was based on exchange of Staples RD stock at a prevailing, minority trading price, which is presumed to be fair market value because Staples RD is widely traded on a liquid market. The other side of the exchange involves the Staples.com stock, which was not valued by reference to market transactions. Instead, the Staples board initially came up with a value after considering valuation models presented by management and confirmed its value judgment based on valuation models from the bankers.

As noted, however, Staples did not instruct its bankers to develop a "fair market value" for Staples.com shares in the manner that an investment banker or finance professor would do. Such a "fair market" valuation would consider share-specific factors such as lack of marketability and would adjust valuation techniques (such as DCF models) that generated non-minority values in order to reach a determination of the fair market value of the Staples.com stock.

While it was not legally imperative for the Staples board to pay Staples.com stockholders a price pegged to fair market value, it is important that the Staples stockholders know how the Staples board defined its approach to value. That is, to the extent that the Staples board did not take into account the type of factors that normally would be given weight in a deter-

mination of the fair market value of shares, this needed to be made clear.

There are at least two reasons for this. First, as noted, the Staples RD part of the exchange was based on a marketable, minority position that would be presumed by investors to be fair market value, and the value measure for the other side of the exchange is therefore highly relevant. Second, the proxy statement indicates that the Staples board favored the Reclassification because it was less expensive than exercising the Repurchase Option.[36] Not only that, parts of the proxy statement state that the board's periodic determinations of the price at which Staples RD would increase its retained interest and at which Staples employees would be issued options were based on a "fair market value" standard. The most recent such price identified in the proxy statement was $7 per share.[37]

One rational implication that could be drawn from the existing disclosures is that the Staples board believed that $7 per share was the fair market value of Staples.com shares, and that $7 per share plus 20.83% was the board's estimate of the cost of exercising the Repurchase Option. While the proxy statement does say that the management valuation the board relied upon did not consider marketability discounts, that disclaimer does not qualify the disclosures regarding the Thomas Weisel and Wit SoundView opinions. Moreover, the proxy never discloses whether the management or banker DCF valuations were adjusted downward to generate a value for *minority* shares in Staples.com.

Although these sort of technical issues may seem trivial, a clear explication of them is material because it can radically alter a reasonable investor's perception of

---

**35.** *Id.* at 6–7.

**36.** *Id.* at 6.

**37.** *Id.* at 27 & 46.

the valuation information contained in the proxy statement. The adjustment of valuations through the subtraction of a marketability discount or any implied control premium can reduce the results significantly. Staples stockholders are entitled to additional disclosures to clarify the method by which management and the bankers generated their determinations of value.[38]

### 2. Does The Proxy Statement Misleadingly Present The Wit SoundView And Management Valuation Analyses?

■ The plaintiffs' next disclosure allegation is, in my view, their most serious. They point out that the proxy statement contains erroneous and misleading information regarding the Wit SoundView and management valuation analyses.

In particular, the plaintiffs note that the proxy statement misleadingly presents the method by which Wit SoundView calculated its comparable companies valuation range. The proxy statement includes the following table listing selected measures of financial performance for the comparables Wit SoundView selected, including "high," "low," "median," and "mean" multiples: [39]

| | Market Value of Common Stock as a Multiple of: | | | |
| | Revenues | | Gross Profit | |
| | 2001E | 2002E | 2001E | 2002E |
|---|---|---|---|---|
| High | 13.4x | 9.4x | 16.5x | 11.4x |
| Low | 0.1x | 0.3x | 0.6x | 1.1x |
| Median | 0.5x | 0.8x | 2.1x | 1.8x |
| Mean | 2.2x | 2.1x | 3.8x | 3.6x |

The proxy statement then says:

> Based on the median multiples identified above, this analysis implied a range of value for the Staples.com Stock of $4.77 to $9.53 per share.[40]

This statement is not accurate. For example, the proxy implies that the $4.77 per share value was derived by multiplying 0.5 times the estimated Staples.com revenues for 2001 and then dividing the resulting number by the implied total number of Staples.com shares (including Staples' retained interest).[41] In fact, Wit SoundView derived the $4.77 per share figure by using a higher multiple than the 0.5 median multiple. Using the 0.5 median multiple yields a value of $3.66 per share.

Likewise, Wit SoundView in fact premised its valuations of Staples.com based on

---

**38.** On a related note, the plaintiffs also assert that the proxy statement is materially misleading because it never identifies a "fair market value" for the Staples.com stock. Without such a set value, the Staples RD stockholders supposedly cannot cast an informed vote on the Reclassification, because they do not know whether that option is preferable to having Staples exercise its right to repurchase the Staples.com stock at fair market value plus 20.83%. The board did not identify such a fair market value and it would therefore be misleading for the proxy statement to say that it did. Rather, the proxy should be supplemented to indicate forthrightly that the Staples board did not calculate the fair market value that would apply if it pursued the Repurchase Option. Once the valuation principles used by management and the bankers are disclosed as discussed above, a Staples RD stockholder who believes that the market would discount the value of Staples.com shares for lack of marketability can subtract a marketability discount of her choice from the deal price, the ranges in the comparable companies analyses, or her subjective view of the value of Staples.com shares without that discount. The stockholder can then add back the 20.83% premium. At that point, the stockholder can assess whether the differences in value makes it advisable to turn down the Reclassification. Likewise, the same stockholder can make a similar downward adjustment to the DCF valuations in the proxy, to account for any minority discount the stockholder feels would apply.

**39.** Proxy at 6.

**40.** Id.

**41.** Wit SoundView used the number 129,965,-825 fully diluted shares to make its calculation.

2002 estimated revenues, 2001 estimated gross profit, and 2002 estimated gross profit on multiples higher than the medians. Using the medians generates values per share of $7.62, $3.39, and $3.82 respectively. Taken as a totality, the median numbers thus generate a value range ($3.66 to $7.62) that creates a much different impression than was given in the proxy statement ($4.77 to $9.53).[42]

Although it may be correct that Wit SoundView had no obligation to use the median multiples, the proxy statement says that it did. This is incorrect and creates the impression that Wit Sound-View did not exercise subjective judgment regarding its core multiples, when it did. Moreover, this impression is coupled with a value range that reinforces the reliability of the $7 per share price, when the median range suggests that price might be high. I believe that this impression is materially misleading.

In so concluding, I embrace an approach that regards the disclosure of false information as particularly calling for correction, where that can be done in a timely manner. This value judgment permeates my thinking on all the issues discussed later in this subsection of the opinion.

The proxy statement also contains a description of Wit SoundView's "precedents transaction analysis" that misdescribes Wit SoundView's analysis in an identical manner. This section of the proxy statement also indicates that Wit SoundView used the medians identified when it actually used different multiples. While Wit SoundView's use of different multiples in this case resulted in a reduction of the value range over that implied by the median multiples, the discrepancy between those results is so striking as to be materi-

al in itself. Using Wit SoundView's selected multiple, its precedent transactions analysis yields a value range of $3.39 to $7.88 a share. Using the median multiples, the same range begins at $13 per share and extends to over $20. The plaintiffs are correct in suggesting that this difference might lead a reasonable investor to give no weight to this aspect of Wit SoundView's fairness analysis.

Next, the plaintiffs point out that the proxy statement says that Wit Sound-View's DCF valuation yielded a range of $5.41 to $9.45 a share. This range is incorrect and was derived from a preliminary document that Wit SoundView prepared. The final Wit SoundView DCF range presented to the CSC was $5.15 to $8.98 a share. While the mid-point of this final range is $7.07 compared to $7.43 for the disclosed range, the difference could be influential in combination with an accurate reporting of the results generated by the use of the actual median multiples in the comparable companies analysis.

■ Lastly, the plaintiffs contend that the proxy statement makes a misleading partial disclosure regarding the comparable companies analysis presented by Staples management to the CSC on March 8, 2001. The proxy statement indicates that that analysis yielded valuation ranges from $380 million to $2.9 million based on Staples.com's forecasted net income for fiscal 2001. The proxy also disclosed management's DCF range of $5.26 to $9.42 a share. The proxy statement also discloses that the CSC found that $7 per share was at or below the midpoint of the range of values yielded by the *analyses* that it reviewed.

**42.** Disclosure of the medians, *see* § IV.B.6. *infra,* should be accompanied by disclosure of

Wit SoundView's selected multiples.

As plaintiffs admit, this statement is technically accurate. The plaintiffs, however, argue that it leaves an impression that is misleading. The proxy statement did not focus on the extremes of the DCF analysis. Instead, it disclosed a range of values that were the focus of management. The mid-point for this *selected range* of the DCF valuation was $7.50 per share, and operates as a rough proxy for a median in the comparable companies analysis. Instead of reporting the comparable companies analysis in a comparably nuanced manner, the proxy statement reports the capacious range generated by the entirety of that analysis, which has a mathematical mid-point of $13.12 per share. Had the proxy statement reported the median value generated by the comparable company analysis,[43] it would have indicated a per share value of only $4.19—a far cry from the $13.12 "midpoint" value that was impliedly disclosed.

Given the other problems with the disclosure of the valuation information, I agree that disclosure of this median value is necessary to make what was disclosed about the management valuations not materially misleading. A reader of the proxy statement could conclude that the board

believed that a responsible mid-point of the valuation analyses presented to it by management equaled $10.31 per share, when a more textured reading of those analysis suggests a much lower figure.

In sum, I conclude that these problems with the proxy statement are material.[44]

3. *Is The Proxy Statement Materially Misleading Because It Does Not Identify The Possible Income Statement Effect Of Accounting For Staples.com Options As Variable?*

■ The plaintiffs argue that the proxy statement is incomplete because it fails to quantify the possible income statement effect that would result if exercise of the Repurchase Option required Staples.com options to be accounted for as variable options. There is no evidence that the Staples board quantified this effect itself, or that the effect can be precisely quantified at this point anyway. The proxy statement discloses that the "ongoing compensation expense" that could result from this accounting treatment would "negatively impact Staples as a whole" and was a consideration in the board's decision not to

---

**43.** On an apples to apples basis, the DCF range would have been reported as $3.33 to $13.69 a share.

**44.** The typical disclosures of information regarding investment banker fairness opinions have a certain quirky character. For example, it is common that such disclosures omit the specific management projections on which the banker's analyses were based. In this case, that occurred even though the management projections were the foundation for all the valuation information provided in the proxy statement. Indeed, the proxy statement inadvertently discloses some of the projections, which can be discerned from certain pages of the proxy statement by anyone with rudimentary mathematical skills. One suspects that the projections are the information

that most stockholders would find the most useful to them.

In their opening brief, however, the plaintiffs did not assert that the proxy statement was materially deficient because it did not set forth the projections used by management and the bankers. Instead, the plaintiffs waited until their reply brief to raise this argument. Thus the argument was not fairly raised and I consider the issue waived for purposes of the preliminary injunction motion. On the other hand, because Staples will have to make further disclosures, I urge it to consider including the actual projections that formed the basis for the management and banker valuations. Such information would obviously be helpful to the stockholders, and disclosure of the projections now will cut off any future claim by the plaintiffs.

exercise the Repurchase Option.[45] The record does not reveal any basis to conclude (even preliminarily) that this was not the case. What should be disclosed to make the disclosure materially accurate, however, is that the board never quantified even a range of the financial impact that this accounting factor could have.

### 4. Did The Proxy Statement Fail To Disclose That Staples.com Was Being Valued As If It Were A Stand–Alone Entity Without Compensating Adjustments For Its Relationship With Staples?

■ The plaintiffs contend that the proxy statement is materially misleading because it fails to point out that the bankers and Staples management valued Staples.com as if it were a stand-alone entity that bore all its own costs in the same manner a truly independent corporation would. In reality, the plaintiffs assert, Staples.com is a subsidized business unit that enjoys below-market access to the existing infrastructure and market reputation of Staples RD, and that has captured sales that would have otherwise been made by a Staples store or through a Staples catalog. By supposedly engaging in the fiction that Staples.com operates as a separate corporate entity without making compensating adjustments for implied subsidies from Staples RD, Staples management and the bankers have valued Staples.com on a misleading premise. In order to ensure that the stockholders are not misled, the plaintiffs contend that additional disclosures are necessary to enable the stockholders to put these valuations in appropriate context.

For several reasons, I reject plaintiffs' argument. As an initial matter, the proxy statement clearly implies that both Staples management and the bankers did in fact value the Staples.com business as if it were a separate economic entity based on Staples' segment reports for that business and without value deductions of the sort plaintiffs say should have been made. I fail to see any danger that the stockholders will misapprehend this foundational fact. It has been clear since the creation of the Staples.com tracking stock that Staples.com would have access to the Staples name, that there was a possibility that Staples RD sales would be diverted to Staples.com, and that Staples.com would have access to Staples RD services and resources pursuant to a complicated accounting and cost-allocation system.[46] Although the plaintiffs are probably correct in arguing that Staples.com was advantaged by its relationship with Staples RD, that advantage was one on which Staples hoped to capitalize from the beginning. What the plaintiffs have not done is produce evidence that suggests that the audited cost-allocation principles that governed Staples.com's use of Staples RD resources were unreasonable, or that any sales Staples.com diverted from Staples RD were not compensated for by the sales, services, and other synergistic benefits that Staples RD derived from the operations of Staples.com.

In any case, no reasonable reader of the proxy statement would misapprehend the Staples board's and its bankers' failure to reduce their valuations based on these factors, especially because the proxy incorporates the company's recent 10–K which contains a section discussing the account-

---

**45.** Proxy at 6.

**46.** The accounting and cost-allocation complications were addressed in the proxy statement issued in connection with the creation of the tracking stock and identified again in the company's most recent 10–K, filed in March, 2001. See DX 2, at 4, 43–44; DX 6, at Notes N & O.

ing and cost-allocation policies governing Staples.com and which reports Staples.com's financials on a separate, segmented basis from Staples R.D.[47]

5. *Is The Proxy Statement Materially Misleading Because It Fails To Disclose The February, 2001 Letters To The British Taxing Authorities?*

■■■ As noted earlier, through counsel Staples informed British taxing authorities in February 2001 that the fair market value of Staples stock was $5.60, based on the price set by the board at the beginning of December 2000. Staples' counsel quickly corrected this and informed the U.K. authorities that the best estimate of fair market value was the $6.10 per share based on the Venture Capitalist purchases in January 2001.

The plaintiffs contend that the stockholders should have been told that just one month before the Staples board set a $7 per share price for the Reclassification, Staples was representing that the fair market value of the Staples.com stock was either $5.60 or $6.10 a share. Although this fact has litigation "flavor," I conclude that it is not sufficiently material to warrant disclosure. It appears that the British attorneys simply used the most recent information they received regarding the price that the Staples board had used to issue options, invest in Staples.com, or purchase Staples.com shares. The proxy statement discloses the fact that Staples bought shares of Staples.com stock from

the Venture Capitalists at $6.10 a share in January[48] and that Staples made a capital contribution to Staples.com at a price of $5.88 per share in January, 2001.[49] For all these reasons, the disclosure of the exchange with the British taxing authorities would not contribute meaningfully to the information mix.

6. *Do These Disclosure Deficiencies Threaten Irreparable Injury And Does The Balance Of Harms Weigh In Favor Of An Injunction?*

■■■ Delaware case law recognizes that an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies. A post-hoc evaluation will necessarily require the court to speculate about the effect that certain deficiencies may have had on a stockholder vote and to award some less-than-scientifically quantified amount of money damages to rectify any perceived harm.

Therefore, our cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected. An injunctive remedy of that nature specifically vindicates the stockholder right at issue—the right to receive fair disclosure of the material facts necessary to cast a fully informed vote—in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.[50]

---

**47.** In reaching this conclusion, I give no weight to the defendants' decision to attach the plaintiffs' entire complaint to the proxy. That complaint does make this valuation point clearer than anything in the proxy. The proxy, however, does not embrace that point or any other feature of the complaint, which is described as being "without merit." Proxy at 27. If director-defendants wish to moot disclosure claims raised by plaintiffs, they should identify the facts they agree with that

are raised by plaintiffs and disclose those facts themselves.

**48.** Proxy at 7.

**49.** *Id.* at 27.

**50.** *See, e.g., Gilmartin v. Adobe Resources Corp.,* Del.Ch., C.A. No. 12467, mem. op. at 29, 1992 WL 71510, Jacobs, V.C. (Apr. 6, 1992); *Sonet v. Plum Creek Timber Co.,* Del.

Such an injunctive remedy is feasible here and there is no undue harm threatened by its use. The Reclassification is not subject to any exigent timing considerations, and a postponement of the meeting date to allow for corrective disclosures is, on balance, worth the cost because it will ensure an informed vote.

C. *Should A Preliminary Injunction Issue Because The Reverse Split Was Implemented Without A Certificate Amendment?*

■ The plaintiffs argue that the retained interest of Staples RD in Staples.com was reduced from 200 million shares to 100 million shares by a method that was not permitted by the Staples certificate of incorporation. As the reader may recall, this reduction occurred in concert with Staples' individual contracts with each of the Staples.com stockholders that effected a *de facto* 1–for–2 stock split to improve possible IPO pricing. Each of those contracts was premised on the fact that Staples' retained interest would be reduced on the same basis. Of course, this reduction took place in the first half of 2000 and has been public knowledge for some time. It would be highly unusual, if not *per se* improper, to undo that complet-

ed transaction through the issuance of a preliminary injunction.[51]

As an equitable matter, the plaintiffs' contention is non-substantive. The reverse split maintained Staples' proportionate interest. Any invalidation of the reverse split would require that the court also treat the individual stockholders equally with Staples, because those stockholders signed the contracts on the assumption that the reverse split would apply to Staples' retained interest. As a result, no economic differences in result could equitably ensue. For these reasons, I will not enjoin the Reclassification on this basis.[52]

D. *Does The Board's Unusual Approach To Setting A Record Date Justify An Injunction?*

■ The plaintiffs' last contention is that the record date for the June 11, 2001 annual meeting was set improperly. Therefore, they seek an injunction until a new record date is fixed in conformity with 8 *Del. C.* § 213.

The relevant factual chronology that I find most likely is as follows. On March 5, 2001, the Staples board decided that the company's annual meeting would occur on June 11, 2001 and set a record date of

---

Ch., C.A. No. 16931, 1999 WL 160174, at *11, Jacobs, V.C. (Mar. 18, 1999).

**51.** *See* 2000 WL 1847679, at *32.

**52.** As a purely legal matter, it is not clear the plaintiffs have a reasonable likelihood of success. The Staples certificate of incorporation expressly states that Staples' retained interest will be automatically "adjusted in proportion to any changes in the number of outstanding shares of Staples.com Stock caused by ... combinations (by reverse stock split, reclassification or *otherwise*) of Staples.com stock...." DX 2, at II–8 (emphasis added). Although the Staples board took an unusual route to reducing the outstanding shares of

Staples.com by effecting a reverse split by hundreds of separate but identical and simultaneously effective contracts, the words "or otherwise" in the certificate may be expansive enough to cover a reverse split by that means. In *Sullivan Money Management Inc. v. FLS Holdings Inc.*, Del.Ch., 12731, mem. op. at 7–8, 1992 WL 345453, Jacobs, V.C. (Nov. 20, 1992), *aff'd*, Del.Supr., 628 A.2d 84 (1993), this court noted that the words "or otherwise" can mean "in any other way" or "in like manner." As the defendants point out, either meaning might suffice to defeat the plaintiffs' argument in this case. As the plaintiffs retort, however, the defendants' approach arguably disrespected 8 *Del. C.* § 242.

March 26, 2001.[53] On April 1, 2001, the Staples board met again and decided to proceed with the Reclassification.

At some point in the meeting, outside counsel for the company noted that the board had to set a new record date because the March 26 record date did not work for a June 11 meeting, and that it was advisable to set a record date that would ensure that the directors were not eligible Staples.com voters. A brief discussion ensued during which the board asked Mahoney to take care of it as CFO. Outside counsel noted that the board could not delegate this function to a non-director, after which the board agreed by consensus to delegate the matter to its Chairman, Stemberg, to handle the matter. Less clear is whether the board formally resolved to constitute Stemberg as a one-member board committee pursuant to 8 *Del. C.* § 141(c)(2).

After the meeting, draft minutes of the meeting were prepared by the corporate secretary, Jack VanWoerkom. These minutes did not reflect the delegation of authority to Stemberg. The minutes were circulated to the outside attorney who had supposedly made it clear to the board that a director had to be charged with the responsibility of setting a record date. VanWoerkom did not remember the outside attorney suggesting that the minutes needed to be changed to add a mention of the board's alleged delegation of authority to Stemberg.[54] Complicating matters further is the fact that Stemberg was asked at his original deposition to review the April 1 draft board minutes and identify if they reflected what happened at the meeting. He answered in the affirmative and did not say that the minutes omitted the board's decision to make him a record date-setting committee of one.[55] Director Nakasone was asked at his original deposition whether the board had taken any action since April 1 regarding the record date. Nakasone said he did not recall, and did not indicate that the board had acted on April 1 to authorize Stemberg to set a record date different than was reflected in the March 5 board minutes.[56]

When the plaintiffs learned of the May 2, 2001 record date from the final proxy statement, they asserted a claim that the record date was invalid because the board had not acted to set it. It was only at this time that the defendants first spelled out their contention that Stemberg had been designated as a one-person committee. The plaintiffs are suspicious of the defendants' story.

I, however, believe that the contemporaneous records of staff-level work on the record date issue in early April suggest that the defendants' recitation of this rather sloppy method of record date-setting is, in many respects, truthful. The large question is whether it is legally insufficient.

Section 213 of Title 8 requires that the setting of a record date for a stockholder vote be accomplished by a board resolution adopted before the record date.[57] Under § 141(c)(2) of the DGCL, a board may delegate this task to a one-person board

---

53. Even this simple issue is clouded, because draft minutes for that same meeting exist that refer to a May 2001 annual meeting date being set. PX 155–57. There also resolutions referring to a April 16, 2001 record date in connection with a June 11, 2001 meeting. PX 159.

54. VanWoerkom Dep. at 12.

55. Stemberg Dep. at 211–12.

56. Nakasone Dep. at 237–38.

57. 8 *Del. C.* § 213(a); R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 7.12 at 7–28 (2001) ("The record date selected by the board cannot precede the date on which the resolution fixing the record date is adopted by the board."); D.A. DREXLER, L.S. BLACK,

committee. But this board committee must itself comply with § 213(a) by adopting a resolution fixing a future record date.

It is quite odd to think of a one-person committee meeting, at which a resolution is made and adopted by its sole member. Nonetheless, such a delegation is expressly permitted by the statute and must be respected to the extent that it actually occurred.

The record here, however, is muddy as to whether Stemberg understood himself to be charged as a one-person committee and whether he in fact fixed a record date himself. Certainly the way that Stemberg approached the record date process contributes to the sense that he did not understand himself to be a committee. Nonetheless, I am willing to credit the defendants' contention that the board did make Stemberg a record date-setting committee. Important to this decision is the board's June 1, 2001 approval of minutes for the April 1, 2001 meeting that formally reflect a resolution to this effect. But the fact that Stemberg was properly authorized does not suffice; he must have fixed the record date himself in accord with § 213.

Critical to my conclusion that the record date was likely set improperly is that the record indicates that Stemberg's involvement in the process of setting the record date ended before the record date was finally selected. According to Stemberg, he had a short conversation with Staples CFO Mahoney sometime on April 4, 2001, during which they discussed the record date. This conversation may have even occurred on a call Stemberg made from a pay phone at a store.[58] It was supposedly

agreed in that conversation that VanWoerkom or Mahoney would identify a suitable record date for Stemberg's approval. VanWoerkom says that he spoke with Stemberg later that same day about a May 2, 2001 record date, which Stemberg then approved. Stemberg himself could not recall his conversation with VanWoerkom but remembered that he had told VanWoerkom on or about that day by direct or indirect means that May 2, 2001 was an acceptable record date.

This brief conversation is allegedly the moment that Stemberg "resolved" to "fix" a May 2, 2001 record date. This moment did not occur at a meeting,[59] nor was it reflected in a written consent in accordance with 8 *Del. C.* § 141(f) and the Staples bylaws. As of today, there is still no written record in the books and records of Staples reflecting Stemberg's "resolution." These facts in themselves may be legally dispositive of the invalidity of the May 2, 2001 record date, because it is plausible to read the DGCL and the Staples' bylaws as requiring that committee action taken outside of a duly convened meeting be taken by written consent. But I rest my ruling elsewhere, lest I reach an erroneous legal judgment in the limited period available to make this ruling.

Instead, my ruling turns on the record evidence that reveals that a few possible record dates were under consideration after Stemberg's last involvement. It was not until April 18, 2001 when Staples' transfer agent was finally advised that May 2, 2001 was the definitive date.[60] There is no evidence that suggests that Stemberg made or even participated in this final decision, or had any involvement with the record date after the brief (and

---

58. Stemberg Dep. at 239.

JR., & A.G. SPARKS, III, DELAWARE CORPORATION LAW AND PRACTICE § 25.03[1], at 25–5 (2000) (record date "cannot precede the date upon which the board acts").

59. *Cf.* 8 *Del. C.* § 142(a).

60. At oral argument, the defendants attempted to explain the later consideration of record dates other than May 2, 2001 as the result of enterprising staff who were keeping options

largely unremembered) conversation(s) he had with Mahoney (and perhaps VanWoerkom) on or about April 4. Stemberg's dearth of memory on this seemingly ministerial subject is perhaps understandable, but undercuts the notion that he "resolved" to set a May 2, 2001 date.[61] Instead, it leaves the impression that he told his staff on April 4 to take care of it themselves. As an evidentiary matter, this impression is, of course, reinforced by the absence of any writing reflecting Stemberg's "resolution" to set a May 2, 2001 record date. Although it is typically that case that a formal committee minute will not be approved until a date subsequent to the adoption of a resolution, in this case no corporate officer undertook to even complete a draft minute or a written consent for later execution by Stemberg.[62]

Given this record, I conclude that it is likely that Stemberg did not fix the record date himself, even if he was charged to do so as a board committee. As a result, it is sensible to enjoin the June 11, 2001 meeting so that the Staples board can set a new record date in conformity with § 213(a)'s requirement that the board or a board committee set the record date by resolution. Because a postponement of the June 11, 2001 vote on the Reclassification is necessary anyway, it also makes sense to correct the record date problem so that it does not subject any of the other matters on the meeting agenda to later challenge. This is a regrettable outcome because the

May 2, 2001 record date provided no unfair tactical advantage to the proponents of the Reclassification, and the requirement to set a new record date imposes additional costs on Staples, and thus its stockholders.

## VI. *Conclusion*

For the foregoing reasons, plaintiffs' motion for preliminary injunction is granted to the extent identified in this opinion. The parties shall collaborate on a conforming order, which they shall present to the court tomorrow for entry.

---

open. The trouble is that the record leads me to infer that the options were in fact open until staff, not Stemberg, closed them. Not only that, the documents that indicate that other options were still under consideration after April 4, 2001 were not produced in discovery until after the plaintiffs deposed the key witnesses about this issue.

**61.** The word "resolution" is classically defined as a "formal expression of the opinion or will of an official body ... adopted by vote." BLACK'S LAW DICTIONARY, 1178

(5th ed.1979). I am not insensitive to the defendants' argument that courts should not require formalistic records of resolutions in all situations, and that § 213 does not explicitly require a writing, in arguable contrast with other sections of the DGCL. But if there is not an authoritative corporate record, there should be other evidence of a convincing nature that demonstrates that a timely resolution passed.

**62.** *See* 8 *Del. C.* § 142(a); § 141(f).