# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MKE HOLDINGS LTD. and<br>DAVID W. BERGEVIN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0729-SG |
| | ) | |
| KEVIN SCHWARTZ, DAVID<br>BUCKERIDGE, ANGELOS<br>DASSIOS, DAVID BROWNE,<br>ROBERT BERENDES, JEFFREY R.<br>GROW, KENNETH AVERY, ADAM<br>FLESS, ALEXANDER<br>CORBACHO, and PAINE SCHWARTZ<br>PARTNERS, LLC, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| VERDESIAN LIFE SCIENCES, LLC, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  October 10, 2019
Date Decided:  January 29, 2020

Thomas E. Hanson, Jr., of BARNES & THORNBURG LLP, Wilmington, Delaware, *Attorney for Plaintiffs*.

Blake Rohrbacher, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: John F. Hartmann and Abdus Samad Pardesi, of KIRKLAND & ELLIS LLP, Chicago, Illinois, *Attorneys for Defendants and Nominal Defendant*.

GLASSCOCK, Vice Chancellor

This Memorandum Opinion represents the second piece of my consideration of the Defendants' Motion to Dismiss. The Plaintiffs here are members of a Delaware LLC, Verdesian Life Sciences, LLC ("Verdesian"). The Plaintiffs' claims allege breach of the contractual analog to fiduciary duties contained in the LLC Agreement—asserted both directly and derivatively on behalf of the LLC—along with fraud and aiding and abetting. In my earlier Memorandum Opinion ("*MKE I*"),[1] I found that the operative contractual duty is good faith. I also found that the derivative claims—principally arising from Verdesian's acquisition of a subsidiary, Specialty Fertilizer Products, LLC—must be dismissed, because it was not reasonably conceivable that the managers had acted in contractual bad faith with respect to the interests of Verdesian.

Addressed in this Memorandum Opinion are the Plaintiffs' remaining claims, which they bring on their own behalf directly against the Defendant managers.[2] The Plaintiffs allege both breach of the LLC Agreement and fraud. With respect to breach of contract, the standard by which these Defendants' actions must be measured—good faith—remains the same,[3] as do the core allegations. I find, however, that it is reasonably conceivable that the managers acted in bad faith or

---

[1] *MKE Holdings Ltd et al. v. Kevin Schwartz, et al.*, D.I. 59. I cite to *MKE I* by the Westlaw citation: *MKE Holdings Ltd. v. Schwartz*, 2019 WL 4723816 (Del. Ch. Sept. 26, 2019).

[2] Plaintiffs also bring aiding and abetting claims against Verdesian's private equity sponsor.

[3] *See* note 134, *infra*.

fraudulently in soliciting the Plaintiffs' equity investments designed to raise funds for the acquisition of SFP. Therefore, the Motion to Dismiss the direct claims is denied in part, although some of the Plaintiffs' claims must be dismissed. My reasoning follows.

## I. BACKGROUND[4]

I draw the following facts from the Plaintiffs' First Amended Verified Complaint (the "First Amended Complaint") and to a limited extent documents incorporated therein.[5] The allegations of the First Amended Complaint, as discussed below, are assumed true for purposes of this Motion.

### A. *The Parties*

Plaintiff MKE Holdings, Ltd. ("MKE") is an Indiana corporation and a Member of Nominal Defendant Verdesian.[6] MKE holds 261,887 Class A Units of Verdesian.[7]

---

[4] The background is a summation of the facts presented in the *MKE I*, referenced *supra* n.1. In *MKE I*, I asked the parties to confer and inform me what direct claims remain. This Memorandum Opinion addresses the direct claims and omits those facts which are not pertinent to the analysis of such claims.

[5] The incorporated documents are the LLC operating agreement of Verdesian, a KPMG report on a potential acquisition by Verdesian, and a rating agency presentation on the same acquisition provided to members of Verdesian. I note that these documents, and others, were produced to Plaintiff MKE Holdings, Ltd. by the Defendants pursuant to a books and records demand, production which was made by agreement that the documents would be considered incorporated in any future litigation between the parties. *See* Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., D.I. 37 ("Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl."), Ex. 2; *see also* June 17, 2019 Oral Arg. Tr. 112:17–113:2.

[6] First Am. Compl. ¶ 12.

[7] *Id.*

Plaintiff David W. Bergevin[8] (with MKE, "Plaintiffs") founded Northwest Agricultural Products, LLC in 1989.[9] Bergevin sold Northwest Agricultural Products, LLC to Verdesian in 2013, and, as a result of the acquisition, became a Member of Verdesian.[10] Bergevin holds 365,471 Class A Units of Verdesian.[11]

Nominal Defendant Verdesian is a Delaware limited liability company with a principal place of business in Cary, North Carolina.[12] It was formed by Defendant Paine Schwartz Partners, LLC ("Paine") in 2012.[13] Verdesian develops, licenses, manufactures, markets, and distribute fertilizers, pesticides, and related agricultural products.[14] It employs a business strategy focused on acquisition, targeting "companies holding proprietary specialty plant health technologies."[15] Verdesian is managed by an eight-member Board of Managers (the "Board of Managers," or, the "Board"), and each member of the Board is appointed by the "Paine Members," a group of entities defined in Verdesian's LLC operating agreement, as described in more detail below.[16]

---

[8] Bergevin is a resident of the State of Washington. *Id*. ¶ 13.
[9] *Id*. ¶ 36.
[10] *Id*.
[11] *Id*. ¶ 13.
[12] *Id*. ¶ 24.
[13] *Id*. ¶ 26.
[14] *Id*.
[15] *Id*.
[16] *Id*. ¶ 29; *see also* Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., Ex. 1, Second Amended and Restated Limited Liability Company Agreement of Verdesian Life Sciences, LLC, dated June 20, 2014 ("Operating Agreement").

Defendant Paine is a Delaware limited liability company with a principal place of business in San Mateo, California.[17] Paine was founded in 2006 and is a successor entity to Fox Paine & Company ("Fox Paine").[18] Affiliates of Paine own over seventy percent of the Class A Units of Verdesian.[19] Paine also has a contractual relationship with Verdesian whereby Paine is paid management service fees based on Verdesian's financial performance, and paid transaction fees on certain Verdesian acquisitions.[20]

Defendant Kevin Schwartz is the President, Chief Executive Officer ("CEO"), and a Founding Partner of Paine.[21] Schwartz has served as a Manager of Verdesian since August 2012.[22]

Defendant David Buckeridge is a Partner at Paine, and previously was the Operating Director of Fox Paine.[23] Buckeridge has served as a Manager of Verdesian since August 2012.[24]

Defendant Robert Berendes is the Operating Director of Paine.[25] Berendes has been the Operating Director of Paine since 2014 and has served as a Manager of

---

[17] First Am. Compl. ¶ 23.
[18] *Id.* ¶ 14.
[19] *Id.* ¶ 27.
[20] *Id.* ¶ 54.
[21] *Id.* ¶ 14.
[22] *Id.*
[23] *Id.* ¶ 15.
[24] *Id.*
[25] *Id.* ¶ 16.

4

Verdesian since August 2014.[26] Berendes has worked at, among other places, McKinsey & Company ("McKinsey"). He is also the Chairman of the Board of Directors of Indigo Ag, Inc. ("Indigo"), a potential competitor to Verdesian.[27]

Defendant Jeffrey R. Grow is the Chairman of Verdesian and served as its CEO from August 2012 to September 2016.[28] Grow has served as a Manager of Verdesian since August 2012.[29]

Defendant Kenneth Avery is the current CEO of Verdesian, replacing Grow in September 2016.[30] Avery has served as a Manager of Verdesian since September 2016.[31]

Defendant Adam Fless is the Managing Director of Paine.[32] Fless has served as a Manager of Verdesian since August 2017.[33]

Defendant Alexander Corbacho is a Principal of Paine.[34] Corbacho has served as a Manager of Verdesian since August 2017 and was an Associate and Senior Associate with Paine from August 2012 to December 2015.[35]

---

[26] *Id.*
[27] *Id.*
[28] *Id.* ¶ 17.
[29] *Id.*
[30] *Id.* ¶ 18.
[31] *Id.*
[32] *Id.* ¶ 19.
[33] *Id.*
[34] *Id.* ¶ 20.
[35] *Id.*

Defendant Angelos Dassios is a Partner at Paine.[36] Dassios served as a Manager of Verdesian from 2012 to 2016, and continues to serve as a member of the Board of Manager's audit committee.[37]

Defendant David Browne is a former Director of Paine, a position he left in June 2017.[38] Browne served as a Manager of Verdesian from 2012 to 2017, and continues to serve as a member of the Board of Manager's audit committee.[39]

*B. Verdesian's Operating Agreement*

Verdesian was formed in August 2012 to sell agricultural products, such as fertilizers and pesticides, the rights to which it planned to obtain through an acquisition strategy targeting entities with proprietary technology.[40] According to Verdesian's Operating Agreement (the "Operating Agreement"), the "full and exclusive discretion" to "manage and control, have the authority to obligate and bind, and make all decisions affecting the business and assets of [Verdesian]" is vested in the Board of Managers.[41] "Members" of Verdesian are listed in the Operating Agreement, and include, among others, MKE and Bergevin.[42]

---

[36] *Id.* ¶ 21.
[37] *Id.*
[38] *Id.* ¶ 22.
[39] *Id.*
[40] *Id.* ¶ 26.
[41] *Id.* ¶ 29; Operating Agreement § 6.1.
[42] Operating Agreement, Appendix B, "Member."

### 1. The Board of Managers of Verdesian

The Board of Managers—per the Operating Agreement—consists of up to eight members (each individually a "Manager", and collectively, the "Managers")[43] and the current Board has seven members.[44]  All Managers are appointed by the "Paine Members,"[45] which is a defined term in the Operating Agreement meaning "Paine & Partners Capital Fund III AIV III, L.P., Paine & Partners Capital Fund III Co-Investors, L.P., Verdesian Co-Investment, L.P. and Verdesian Co-Investment Blocker, Inc."[46]  The Paine Members, all affiliates of Paine, own over seventy percent of the Class A Units of Verdesian.[47]

According to the Operating Agreement, a "Manager shall perform his duties as a manager in good faith, in a manner he reasonable believes to be in or not opposed to the best interests of the Company, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances."[48]  However, this standard is explicitly subject to another subsection of the Operating Agreement, whereby:

---

[43] First Am. Compl. ¶ 29; Operating Agreement § 6.2(a).
[44] First Am. Compl. ¶ 29.
[45] *Id*.
[46] Operating Agreement, Appendix B, "Paine Members."  The Operating Agreement technically indicates that the Paine Members have the right to appoint six of the eight Managers; the remaining two are appointed by the "Rollover Members," unless the "Rollover Members" ownership drops below fifteen percent, in which case, those two remaining Managers are appointed "by the Members owning a majority of the outstanding Units."  *Id.* § 6.2(a).
[47] First Am. Compl. ¶ 27.
[48] *Id*. ¶ 30; Operating Agreement § 6.4(b).

. . . whenever in this Agreement a Manager or Member is permitted or required to make a decision (i) in its, his or her discretion or under a grant of similar authority, such Manager or Member shall be entitled to consider only such interests and factors as such Manager or Member desires, including its, his or her own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its his or her good faith or under another express standard, such Manager or Member shall act under such express standard and shall not be subject to any other or different standards.[49]

Additionally, the Members, by agreeing to the Operating Agreement, "acknowledge that the Managers may or could have conflicts of interest to the extent that they are requested or obliged to make decisions . . . with respect to . . . the rights of the Members."[50] The Members "to the fullest extent permitted under the LLC Law . . . waive any such conflicts of interest directly or indirectly associated with decisions, and agree that each such Manager shall be entitled to make decisions and determinations as Member or Manager in his, her or its self-interest."[51]

Further according to the Operating Agreement, "to the extent that, at law or in equity, a Manager . . . has duties, including fiduciary duties, and liabilities relating thereto to the Company . . . such Person acting under this Agreement shall not be liable to the Company . . . for its good faith reliance on the provisions of this Agreement . . . ."[52] Furthermore, "[n]otwithstanding anything contained in this

---

[49] Operating Agreement § 6.4(e).
[50] *Id.* § 6.9(b).
[51] *Id.*
[52] *Id.* § 6.9(a).

8

Agreement to the contrary, to the fullest extent permitted under the LLC Law, the Members of Verdesian hereby waive any fiduciary duty of the Managers, so long as such Person acts in a manner consistent with [the Operating Agreement]."[53]

The Operating Agreement also provides that Managers, as "Covered Person[s]," are not liable "to the Company . . . for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement."[54] Managers, specifically, are also not liable "to the Company or to any Member for any actions taken in good faith and reasonably believed to be in or not opposed to the best interests of the Company, or for errors of judgment, neglect or omission."[55]

The Managers are charged with managing "the affairs of [Verdesian]."[56] Under the Operating Agreement, Verdesian will "[c]ause to be prepared and distributed to each Member holding Class A, Class A-1 or Class A-2 Units audited annual financial statements within ninety (90) days after the end of each fiscal year

---

[53] *Id*. § 6.9(b).
[54] *Id*. § 6.7(b).
[55] *Id*. § 6.4(d).
[56] *Id*. § 6.4(a).

or as soon thereafter as is reasonably practicable and monthly unaudited financial statements within forty-five (45) days after the end of each month."[57]

### C. MKE and Bergevin Become Members of Verdesian

After its formation in August 2012, Verdesian made its first acquisitions between September 2012 and April 2013.[58] Verdesian acquired Biagro Western Sales, Inc. ("Biagro"),[59] Northwest Agricultural Products, LLC ("NAP"),[60] and Plant Syence Ltd. ("Plant Syence").[61] NAP was founded by Plaintiff Bergevin in 1989.[62] Verdesian acquired NAP from Bergevin in February 2013 for $34 million.[63]

Bergevin invested $7 million of the proceeds of his sale of NAP back into Verdesian.[64] Bergevin received 278,441 Class A Units and became a Member of Verdesian.[65] Bergevin also became a guest of the Board of Managers.[66]

---

[57] First Am. Compl. ¶ 31; *see also* Operating Agreement § 7.2(e).

[58] First Am. Compl. ¶ 34.

[59] "Biagro . . . manufactured and sold phosphite plant nutrition and fertilizer products, including Nutri-Grow and Nutri-Phite." *Id.* ¶ 35.

[60] "NAP . . . offer[ed] specialty agricultural products, including Sterics, which enhance the absorption of phosphorous, and PolyAmines, an amino acid that delivers essential micronutrients." *Id.* ¶ 36.

[61] *Id.* ¶ 34. "[Plant] Syence . . . was a supplier of plant nutritional solutions to the agriculture and horticulture markets." *Id.* ¶ 35.

[62] *Id.* ¶ 36.

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

Verdesian later acquired INTX Microbials, LLC ("INTX"),[67] which was formed in 2002, from Plaintiff MKE in a two-part transaction, one part in September 2013, and the second part in January 2014.[68] Verdesian acquired INTX from MKE for $32 million.[69] MKE invested $5 million of the proceeds of its sale of INTX back into Verdesian.[70] MKE received 198,887 Class A Units and became a Member of Verdesian.[71] MKE's principal also became a guest of the Board of Managers.[72]

Verdesian's revenue for 2013 was $53 million and it had an Adjusted EBITDA in 2013 of $14.5 million.[73] Paine received management fees from Verdesian of $196,630 in 2013.[74] Paine also received, in 2012 and 2013, a combined $3.7 million in transaction fees related to Verdesian's acquisition of Biagro, NAP, Plant Syence, and INTX.[75]

*D. Verdesian's Acquisition of Specialty Fertilizer Products, LLC*

During a May 15, 2014 meeting of the Board of Managers, Verdesian's management announced it had executed a purchase agreement to acquire Specialty

---

[67] "INTX . . . manufactured biological products for agricultural crop production. Among other products, INTX offered legume seed inoculants, biological growth promoters and adjuvants for agriculturally applied pesticides." *Id.* ¶ 37.

[68] *Id.* ¶¶ 37–38.

[69] *Id.* ¶ 37.

[70] *Id.* ¶ 38.

[71] *Id.* Verdesian first purchased sixty-five percent of INTX in September 2013, and at that time MKE reinvested $3 million into Verdesian. *Id.* Verdesian purchased the remaining thirty-five percent of INTX in January 2014, at which time MKE reinvested $2 million into Verdesian. *Id.*

[72] *Id.*

[73] *Id.* ¶ 40.

[74] *Id.* ¶ 54.

[75] *Id.*

Fertilizer Products, LLC ("SFP") for $313.5 million.[76] SFP's revenue for 2013 was $68.1 million and it had an Adjusted EBITDA of $26.6 million.[77]

1. Concerns Related to the Specialty Fertilizer Products, LLC Acquisition

On April 10, 2014, as part of the SFP acquisition, KPMG prepared a due diligence report for Verdesian.[78] KPMG's report (the "KPMG Report") noted that year-to-date sales for SFP in March 2014 were fifteen percent lower than for the same period the previous year.[79] The KPMG Report also detailed SFP's introduction "in the second half of [fiscal year] 2013" of a "bulk and early fill sales program."[80] Prior to this program, SFP's "sales season peaked in spring during the planting season."[81] The bulk and early fill sales programs "incentiviz[ed] dealers with discounts" in order "to increase dealer demand, accelerate business growth, enhance operational capacity and allow access to a high volume market."[82] According to KPMG, the 2013 "programs were successful and, as a result, sales peaked a second time in FY 13 during Q3 and Q4."[83] In other words, SFP's 2013 sales results

---

[76] *Id.* ¶¶ 43, 52. "SFP was a wholesaler of plant health products and fertilizers to retailers in the Midwest." *Id.* ¶ 43.
[77] *Id.* ¶ 43.
[78] *Id.* ¶ 46.
[79] *Id.*
[80] *Id.* ¶ 47.
[81] *Id.*
[82] *Id.*
[83] *Id.*

included two sales peaks.[84]  KPMG noted that there was "a risk [that] this double sales peak will not recur next year," as the bulk and early fill programs had accelerated sales from the first quarter of 2014 into the fall of 2013.[85]  As a result, KPMG wrote, "FY 13 includes a onetime benefit due to the business shift."[86]

United Suppliers, Inc. ("United Suppliers"), one of SFP's primary retail customers, also provided commentary on SFP.[87]  United Suppliers warned Verdesian that SFP had presold a significant amount of product in 2013, and would therefore be unable to achieve the same level of sales in the future (the "United Suppliers Communications").[88]  In other words, United Suppliers represented to Verdesian's Managers that SFP had "stuff[ed] the channel."[89]  United Suppliers did, however, expect its order with SFP to increase year-over-year.[90]

### 2. Verdesian Proceeds with the Specialty Fertilizer Products, LLC Acquisition

With knowledge of the KPMG Report and the United Suppliers Communications, Verdesian's Managers decided to acquire SFP.[91]  Verdesian funded the $313.5 million acquisition of SFP through $200 million in third-party

---

[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] *Id.* ¶ 49.
[88] *Id.*
[89] *Id.* ¶¶ 49–50.
[90] Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., Ex. 4, Report from KPMG titled 'Project Fertilizer,' dated April 10, 2014, at 9.
[91] First Am. Compl. ¶ 51.

13

debt financing and $160 million in new equity financing.[92]  On June 1, 2014, as part

of the new equity financing, Verdesian issued a "Notice of Preemptive Rights" and

offered its existing unitholders the opportunity to purchase additional Class A Units

at a price of $47.11 per Unit.[93]  In soliciting this new equity financing from

Verdesian's Members, the Managers did not specifically disclose the findings of the

KPMG Report or the United Suppliers Communications.[94]  Instead, the Managers

indicated that SFP's 2013 earnings were a reliable indicator of its future

performance.[95]  The Managers also sent to the Members a presentation on the SFP

acquisition, prepared for the credit rating agencies (the "Rating Agency

Presentation"), which indicated that "SFP underperformance y-o-y driven in part by

transition of portion of business from spring planting season to autumn as part of an

Early Fill program.  Expect meaningful uptick in summer and fall months."[96]  The

Managers also represented to the Members that Verdesian, with SFP, would have an

enterprise value of $514 million.[97]

---

[92] *Id.* ¶¶ 52, 103.
[93] *Id.* ¶ 103.
[94] *Id.* ¶ 52.
[95] *Id.* ¶ 104.
[96] Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., Ex. 7, Verdesian Life Sciences LLC Ratings Agency Presentation, dated May 2014, at 48.
[97] First Am. Compl. ¶ 104.

In connection with the new equity financing, MKE contributed $3 million and Bergevin contributed $4.1 million.[98] The SFP acquisition closed on July 1, 2014.[99]

Paine, by contract, receives a management service fee based on Verdesian's financial performance and transaction fees on certain Verdesian acquisitions.[100] Accordingly, Paine received a transaction fee of $6 million for Verdesian's acquisition of SFP.[101] In 2014, Verdesian's Adjusted EBITDA (including SFP) was $45.3 million.[102] In 2014 and 2015, following the acquisition of SFP, Paine received management service fees of $1,145,053 and $1,205,798, respectively.[103] In 2013, Paine had received a management service fee of less than $200,000.[104]

*E. Verdesian's Class P Offering*

MKE received its K-1 for 2016 for Verdesian in May 2017, and afterwards inquired to the Managers about the loss in value of its interest in Verdesian due to Verdesian's poor performance.[105] Instead of addressing Verdesian's performance, the Managers responded that Verdesian was being positioned for a sale.[106] The Managers represented that a sale was being targeted for the fourth quarter of 2018

---

[98] *Id.* ¶ 52.
[99] *Id.* ¶ 51.
[100] *Id.* ¶¶ 28, 54.
[101] *Id.* ¶ 54.
[102] *Id.* ¶ 152.
[103] *Id.* ¶ 54.
[104] *Id.*
[105] *Id.* ¶ 75.
[106] *Id.* ¶ 76.

or the first quarter of 2019, and that Class A unitholders would be able to recoup their investments in such a sale.[107] Verdesian's Adjusted EBITDA for 2017 was $30.2 million.[108]

On August 20, 2018, Verdesian issued an Offering Notice to its Members, notifying them of its intent to issue a new class of preferred units, Class P Units (the "Offering").[109] Each Class P Unit would be offered at $44.30 per unit.[110] At that price, Verdesian was valued at a six percent loss relative to its value after acquiring SFP in July 2014.[111] During the intervening time, Verdesian's EBITDA had decreased by thirty-three percent.[112] The new Class P Units also had a distribution preference: in the event of a sale, Class P unitholders would receive double the Class P Unit price.[113] The Class P Units' preference would supersede Class A Units' first priority in the event of a distribution from a liquidity event.[114] Verdesian's management was also allowed to participate in the Offering.[115]

---

[107] *Id.*
[108] *Id.* ¶ 152.
[109] *Id.* ¶ 79.
[110] *Id.* ¶ 80.
[111] *Id.* ¶ 81.
[112] *Id.* ¶ 80.
[113] *Id.* ¶ 81.
[114] *Id.* ¶ 92.
[115] *Id.* ¶ 83.

On September 13, 2018, MKE and Bergevin sent a letter to Verdesian asking it to retract the Offering.[116] Verdesian responded by letter on September 14, 2018.[117] Verdesian refused to retract the Offering and indicated that it believed the Offering to be fair because Class A unitholders could participate.[118] In separate communications with MKE, Verdesian indicated that it could find a buyer for MKE's Class A Units at price not to exceed $30.55 per Unit.[119]

Verdesian closed the Offering on November 30, 2018.[120] Prior to the Offering, Paine Members and Buckeridge together held eighty-five percent of Verdesian's Class A Units.[121] Paine Members purchased 397,165 Class P Units, Verdesian's management (Grow and Avery) purchased 11,396 Class P Units, and Buckeridge, indirectly, purchased 5,201 Class P Units.[122] None of the minority Class A unitholders (that is, the non-Paine-affiliated Class A unitholders) participated in the Offering.[123] Given the Class P Units' preference in the event of a sale, Verdesian would have to be sold for $560 million in order for all Class A unitholders to receive proceeds sufficient to fully return their investment.[124]

---

[116] *Id.* ¶ 88.
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] *Id.* ¶ 90.
[121] *Id.* ¶ 91.
[122] *Id.* ¶ 90.
[123] *Id.*
[124] *Id.* ¶ 92.

*F. MKE's Books and Records Demand*

MKE made a books and records demand on Verdesian on October 12, 2017.[125] Verdesian made productions to MKE on November 28, 2017, December 5, 2017, December 7, 2017, and December 22, 2017.[126] These productions included audited financial statements, which had never been provided to MKE (or Bergevin) despite being required by the Operating Agreement.[127] Following the productions, Verdesian continued to fail to provide MKE and Bergevin with audited financial statements going forward; the audited financial statements for 2017 were due to them, per the Operating Agreement, on April 1, 2018.[128]

*G. Procedural History*

MKE and Bergevin filed a Complaint on October 9, 2018. They then filed the First Amended Complaint on January 14, 2019.[129] The Defendants filed a Motion to Dismiss the First Amended Complaint on March 1, 2019. I heard Oral Argument on the Motion to Dismiss on June 17, 2019. On September 26, 2019, I issued *MKE I* granting the Defendants' Motion to Dismiss the Plaintiffs' derivative claims and instructed the parties to consult to determine what direct claims remain.

---

[125] *Id.* ¶ 45.
[126] *Id.* ¶¶ 112–115.
[127] *Id.* ¶ 31.
[128] *Id.*
[129] The Defendants had previously moved to dismiss the initial Complaint on November 16, 2018. Defs.' Mot. to Dismiss, D.I. 10.

The parties wrote to me on October 10, 2019 specifying the remaining direct claims, and I considered the Motion submitted for decision on that date.

## II. ANALYSIS

The Plaintiffs bring three counts in connection with their direct claims: breach of contract (the Operating Agreement), fraud, and aiding and abetting.[130] The Defendants have moved to dismiss the fraud claim under Rule 9(b) and all claims under Rule 12(b)(6). The Defendants further argue that some of the Plaintiffs' claims are time-barred. I analyze the Plaintiffs' claims below.

The Defendants have moved to dismiss all claims pursuant to Chancery Court Rule 12(b)(6).[131] The standard of review for a Rule 12(b)(6) motion is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[132]

When reviewing a motion to dismiss, the Court may take into consideration documents "incorporated into the pleadings by reference and may take judicial notice of relevant public filings."[133]

---

[130] The breach of contract and fraud claims are brought against the Managers and the aiding and abetting claim is brought against Paine.

[131] Ch. Ct. R. 12(b)(6).

[132] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations and internal quotation marks omitted).

[133] *See Fairthorne Maint. Corp. v. Ramunno*, 2007 WL 2214318, at *4 (Del. Ch. Jul. 20, 2007) (citations omitted).

*A. Breach of Contract and Fraud Claims*[134]

The Plaintiffs have alleged three breaches of the Operating Agreement by the Managers: (1) in connection with the solicitation of new cash equity for the SFP transaction, (2) in connection with the issuance of the Class P Units, and (3) failure to provide the Plaintiffs with audited annual financial statements and monthly unaudited financial statements.[135]  The Plaintiffs have also alleged fraud in connection with the SFP transaction.

In *MKE I*[136] I analyzed the standard of conduct required of the Managers by the Operating Agreement.  I determined that the Operating Agreement "directs the Managers to operate in good faith and with ordinary care" and "effectively exculpates Managers for conflicted, negligent and other detrimental decisions . . . so long as taken in good faith."[137]  Consequently, in order to be liable for breach of the Operating Agreement, a Manager must act in bad faith.[138]  I evaluate each of the Plaintiffs' claims for breach of the Operating Agreement under this standard to determine if they state a claim upon which relief may be granted.

---

[134] I assume for purposes of this Memorandum Opinion that the contractual duties owed by the Managers pursuant to the Operating Agreement apply to the transactions at issue in the Plaintiffs' direct claims.

[135] *See* Letter of October 10, 2019, D.I. 60, at 1–2.

[136] *MKE Holdings Ltd. v. Schwartz*, 2019 WL 4723816 (Del. Ch. Sept. 26, 2019).

[137] *Id*. at *9.

[138] *Id*. at *10.

1. <u>Verdesian's Acquisition of Specialty Fertilizer Products, LLC</u>

a. Breach of Contract

The Plaintiffs' direct claim for breach of contract in connection with Verdesian's acquisition of SFP relies on the same core facts as its derivative claim. The derivative claim was dismissed in *MKE I* based on my finding that, from the perspective of *Verdesian*, "[i]t is not reasonable to infer bad faith from the SFP transaction based on the Manager's desire to drive fees to Paine, because the value of the transaction and management service fees to Paine is dwarfed by the potential loss to Paine from Verdesian's acquisition of SFP for several hundred million dollars."[139] However, the direct claim is different in this respect: it alleges that the Managers *solicited* the $7.1 million equity infusion from MKE and Bergevin by "falsely tout[ing] SFP's 2013 earnings as reliable and fail[ing] to disclose the warnings from KPMG and [United Suppliers] that the earnings were unsustainable and would not be repeated."[140] The Plaintiffs were entitled to participate in this equity offering under the terms of the Operating Agreement. The action alleged to be in bad faith is not the investment in SFP itself—unsuccessfully pursued by the Plaintiffs derivatively on behalf of Verdesian—but the solicitation of the equity contribution from the Plaintiffs to fund a portion of the purchase price—pursued

---

[139] *Id*. at *11.
[140] First Am. Compl. ¶ 130.

21

directly. The question is whether the Defendants dealt with Plaintiffs *themselves* in bad faith.

The Plaintiffs have alleged that the Managers' failure to disclose the KPMG Report and the United Suppliers Communications was in bad faith and in breach of the Operating Agreement. The KPMG Report noted that SFP's 2014 year-to-date sales as of March 2014 were fifteen percent lower than for the same period the previous year.[141] The KPMG Report also detailed SFP's "bulk and early fill sales program," introduced in 2013, which "incentiviz[ed] dealers with discounts" in order "to increase dealer demand, accelerate business growth, enhance operational capacity and allow access to a high volume market."[142] According to the KPMG Report, the program was successful (at least temporarily), leading to a second sales peak during Q3 and Q4 of 2013.[143] The KPMG Report noted a risk that the double sales peak will not recur because the bulk and early fill sales program had accelerated sales from the first quarter of 2014 into the fall of 2013.[144] United Suppliers, a top SFP retail customer representing at least half of SFP's business, allegedly echoed similar concerns, noting a significant amount of presold product in 2013, i.e. that

---

[141] *Id* ¶ 46.
[142] *Id* ¶ 47.
[143] *Id*. Prior to the bulk and early fill sales program, SFP's sales season peaked in spring during the planting season, which allegedly occurred as expected in early 2013.
[144] *Id*.

SFP "stuffed the channel."[145] The Plaintiffs allege that the withholding of the KPMG Report and the United Suppliers Communications, combined with the Managers' representations of SFP's future prospects,[146] gave Plaintiffs a false picture of SFP's 2013 performance. In other words, the Defendants acted in bad faith; misleading the Plaintiffs by implying that the Plaintiffs could predict 2014 results from 2013's performance, when in fact that performance was front-loaded, enhanced to the detriment of 2014, and not indicative of future performance.

At this stage in the litigation, I must draw all reasonable inferences in favor of the Plaintiffs and may dismiss the breach of contract claim "only if it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the [Plaintiffs] would not be entitled to relief."[147] The Plaintiffs have pled that they did not receive the KPMG Report nor the United Suppliers Communications from the Managers before making their equity investment in connection with the SFP acquisition. The Managers do not dispute this, conceding

---

[145] *Id*. ¶¶ 49–50. The Defendants have noted that United Suppliers did, however, expect its order with SFP to increase year-over-year. Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., Ex. 4, Report from KPMG titled 'Project Fertilizer,' dated April 10, 2014, at 9.

[146] The Rating Agency Presentation noted: "SFP underperformance y-o-y driven in part by transition of portion of business from spring planting season to autumn as part of an Early Fill program. Expect meaningful uptick in summer and fall months." Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., Ex. 7, Verdesian Life Sciences LLC Ratings Agency Presentation, dated May 2014, at 48.

[147] *Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2009) (quoting *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008)).

that the Plaintiffs received the KPMG Report only after the MKE's books and records demand.[148] The Plaintiffs have averred that such non-disclosure was in bad faith because it was intended to induce the Plaintiffs to invest without revealing an accurate picture of SFP's business—specifically the replicability of its 2013 performance.

The Managers have not (at this pleading stage) offered a cogent response as to *why* the KPMG Report and the United Suppliers Communications were withheld.[149] Without a competing explanation, it is not unreasonable to infer that such withholding was done on the basis of bad faith to solicit equity contributions from the Plaintiffs and consequently receive transaction and management service fees for the transaction while decreasing the amount that the Managers had to borrow—or cause Paine to contribute itself—to fund the acquisition. Moreover, I am unable to say whether receipt of the KPMG Report and the United Suppliers Communications would have "alter[ed] the total mix of information" available to

---

[148] Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., at 28–29. The Defendants likewise do not contend that the United Suppliers Communications were transmitted to the Plaintiffs, but take issue with the characterization (and purported existence) of the United Suppliers Communications.

[149] The Defendants contend that although the Plaintiffs did not receive the KPMG Report and the United Suppliers Communications, the Rating Agency Presentation notified the Plaintiffs of the bulk and early fill sales program and if Plaintiffs were "concerned with underperformance" they should have "taken up Defendants on their offer to answer questions." Reply Br. in Supp. of Defs.' Mot. to Dismiss Pls.' First Am. Compl., D.I. 50 ("Reply Br. in Supp. of Defs.' Mot. to Dismiss Pls.' First Am. Compl."), at 7 (internal quotation marks omitted). This argument may concern the tolling of the statute of limitations—discussed *infra* Section II.A.1.c—but is not sufficient to negate bad faith.

the Plaintiffs at the time of the equity solicitation because it is unclear, on this record, what other information was available to the Plaintiffs at the time of their respective equity contributions.[150] Given the plaintiff-friendly inferences applicable at the pleading stage I assume the KPMG Report and the United Suppliers Communications were material.

On these allegations and at this stage in the litigation, I cannot say with reasonable certainty that there is no set of facts that could be proven to support a breach of the contractual duty of good faith in connection with the solicitation of equity from the Plaintiffs for the SFP acquisition.

### b. Fraud

Apart from their breach of contract claim in connection with the SFP acquisition, the Plaintiffs have alleged that the Managers also engaged in fraud when they solicited new cash equity from the Plaintiffs for the acquisition. The fraud claim is based on the same allegations as the breach of contract claim discussed *supra* Section II.A.1.a. The Managers contend that the Plaintiffs do not plead fraud with the particularity required by Chancery Court Rule 9(b).[151]

The elements of common law fraud are: (1) a false representation, usually one of fact, made by the defendant, (2) the defendant's knowledge or belief that the

---

[150] *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *11–16 (Del. Ch. June 30, 2014).
[151] Ch. Ct. R. 9(b).

representation was false, or was made with reckless indifference to the truth, (3) an intent to induce the plaintiff to act or to refrain from acting, (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation, and (5) damage to the plaintiff as a result of such reliance.[152]

In order to state a claim for common law fraud, the Plaintiffs must allege with the particularity required by Rule 9(b) that the Managers either "(1) represented false statements as true, (2) actively concealed facts which prevented [the Plaintiffs] from discovering them, or (3) remained silent in the face of a duty to speak."[153]  The circumstances required to be stated with particularly in Rule 9(b) "refer to the time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby."[154]  However, malice, intent, knowledge and other condition of mind of a person may be averred generally.[155]  Essentially, the Plaintiffs, to survive the Motion to Dismiss under Rule 9(b) must allege the circumstances of the fraud with detail sufficient to apprise the Managers of the basis for the claim.[156]  Where pleading a

---

[152] *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *8 (Del. Ch. July 24, 2009) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

[153] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004) (citing *Stephenson*, 462 A.2d at 1074) (numbering modified).

[154] *York Linings v. Roach*, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999) (quoting *C.V. One v. Resources Grp.*, 1982 WL 172863, at *2 (Del. Super. Dec. 14, 1982)).

[155] Ch. Ct. R. 9(b).

[156] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *19 (Del. Ch. Nov. 26, 2014) (quoting *ABRY Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006)).

claim of fraud that "has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that 'something' was knowable and that the defendant was in a position to know it."[157]

The Plaintiffs have offered argument as to how the Managers (1) represented false statements as true, (2) actively concealed facts which prevented Plaintiffs from discovering them, and (3) remained silent in the face of a duty to speak.[158]  This reflects the fact that the Plaintiffs' allegations encompass, to some extent, all three categories.  However, in order to survive this Motion to Dismiss, only one need be pled with particularity.  Because the core of the Plaintiffs' fraud claim is the non-disclosure of the KPMG Report and the United Suppliers Communications, I consider only whether the Plaintiffs have plead with particularity that the Managers actively concealed facts which prevented the Plaintiffs from discovering them.

In order to plead active concealment the Plaintiffs' pleading must "support an inference that the [Managers] took some action affirmative in nature designed or intended to prevent and which does prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation

---

[157] *Id*. (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005); *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998)).
[158] Pls.' Answ. Br. in Opp'n to Defs.' Mot. to Dismiss, D.I. 47 ("Pls.' Answ. Br. in Opp'n to Defs.' Mot. to Dismiss"), at 57–60.

intended to exclude suspicion and prevent injury."[159]  A fraudulent concealment claim "requires the plaintiff to allege 'an intentional deception of the plaintiff by the defendant, which the plaintiff relies upon to his detriment'"[160] and must plead "more than mere silence"[161]  The Plaintiffs' fraud claim here clears that bar.

The Plaintiffs allege that a slide presentation distributed to the Plaintiffs, referencing "Key Initiatives" of Verdesian, noted specifically Verdesian's annual audit by KPMG, but did not include the plan to engage KPMG to assist in SFP due diligence even though the engagement with KPMG was finalized the following day.[162]  The Plaintiffs also plead that at the May 14, 2014, they were represented as guests of the Board.  At such meeting the Board announced the SFP purchase agreement, but never discussed the status of the SFP negotiations or the related due diligence in Plaintiffs' presence.  Instead, the Managers met separately, and without the participation of the guests of the Board (including the Plaintiffs).[163]  Presumably, diligence review was discussed outside of the Plaintiffs' (or their respective representatives') presence.  The Plaintiffs further allege that the Managers had

---

[159] *Wiggs v. Summit Midstream Partners, LLC*, 2013 WL 1286180, at *11 (Del. Ch. Mar. 28, 2013) (quoting *Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *7 (Del. Ch. Apr. 10, 2008)) (internal alterations and quotation marks omitted).

[160] *Id.* (quoting *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *12 (Del. Ch. Apr. 20, 2009)).

[161] *Id.* (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 150 (Del. Ch. 2004)).

[162] First Am. Compl. ¶ 99.

[163] *Id.* ¶ 98.

possession of the KPMG Report and the United Suppliers Communications at the time that the Managers solicited the equity contribution from the Plaintiffs.[164] The Managers, according to the First Amended Complaint, "touted SFP's 2013 earnings as reliable" all while "fail[ing] to disclose the warnings from KPMG and [United Suppliers] that the earnings were unstainable and would not be repeated."[165]

The First Amended Complaint supports an inference that the Managers took affirmative action designed or intended to prevent and which did prevent, the discovery of the KPMG Report, the United Suppliers Communications, and, consequently, an accurate picture regarding SFP's 2013 performance. That the Plaintiffs, guests of the Board who were solicited for a combined equity contribution of over $7 million, were not informed of the existence of the KPMG Report or the United Suppliers Communications, or at a minimum, that KPMG was conducting due diligence on a significant acquisition, leads to a reasonable inference that the Managers concealed the KPMG Report and the United Suppliers Communications to present a rosier picture of SFP's financials to the Plaintiffs. Both the KPMG Report and the United Suppliers Communications bear on the utility of SFP's 2013 performance in determining the value of SFP, and, consequently, the soundness of the new cash equity contribution by the Plaintiffs. That the Plaintiffs did not receive

---

[164] *Id.* ¶ 52.
[165] *Id.* ¶ 130.

such information induced them to contribute additional equity without the benefit of such information, which may have altered their decision making to their detriment.[166] The Plaintiffs have consequently pled fraud—in connection with the equity contribution by the Plaintiffs for the SFP acquisition—with the particularly required by Rule 9(b).[167]

### c. Tolling

The Defendants have moved to dismiss the SFP-related breach of contract claims and fraud claims as time-barred, arguing that they accrued at the latest on July 1, 2014—the date the acquisition closed—while noting that Plaintiffs' original complaint in this Action was not filed until October 9, 2018. The Plaintiffs counter

---

[166] The Defendants submit that because the Managers received over 650 pages of due diligence reports—"voluminous" in the Defendants' reading—the Managers were entitled to provide the Plaintiffs a summary of the due diligence and were under no obligation to disclose the KPMG Report or the United Suppliers Communications themselves. Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., at 51. However, the cases cited by the Defendants refer to solicitations for investor action pursuant to public company and/or target-side merger proxies—given the disparate transactional settings in those cases compared to this Action, I do not find such reasoning persuasive. *See id*. (citing *TCG Sec., Inc. v. S. Union Co*., 1990 WL 7525 (Del. Ch. Jan. 31, 1990) (Analyzing merger-related claims by former stockholder of defendant Southern Union, whose stock "trade[d] publicly on the New York Stock Exchange and [was] widely held"); *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934 (Del. Ch. 2001) (Analyzing a proposed share reclassification of shares of Staples, Inc., a publicly traded company); *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024 (Del. Ch. Nov. 30, 2007) (Analyzing breach of fiduciary duty claims by former stockholders in connection with an allegedly materially false and misleading merger proxy statement)).

[167] Because I have found the Plaintiffs' pleadings sufficient with respect to fraudulent concealment, I need not address the Plaintiffs' alternate theories of false statements and silence notwithstanding a duty to speak. Those theories are preserved for consideration on a developed record, as well.

that the breach of contract and fraud claims are timely because they were tolled under the fraudulent concealment doctrine.

Although this is a court of equity, "equity follows the law, and this court will apply statutes of limitations by analogy."[168] The statute of limitations for both breach of contract and common law fraud is three years.[169] But the statute of limitations may be tolled when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth.[170] Under this doctrine, a plaintiff must allege "an affirmative act of actual artifice by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth."[171] "[T]he limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued*, would lead to the discovery of the injury . . . the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme."[172] Our Supreme Court has noted that "whatever is

---

[168] *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 812 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

[169] 10 *Del. C.* § 8106; *Crowhorn v. Nationwide Mut. Ins. Co.*, 2002 WL 1767529, at *5 (Del. Super. July 10, 2002).

[170] *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).

[171] *Id.* (internal quotation marks omitted).

[172] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *7 (Del. Ch. July 17, 1998) (emphasis in original) (citations omitted).

notice calling for inquiry is notice of everything to which such inquiry might have led."[173]

I have found above that the Plaintiffs have pled facts to support a reasonable inference that the Managers actively concealed the existence of the KPMG Report and the United Suppliers Communications. Such active concealment constituted an actual artifice that prevented the Plaintiffs from obtaining the knowledge underlying their contractual and breach of contract claims. In other words, the Managers' alleged actions "prevented [the Plaintiffs] from gaining material relevant knowledge in an attempt to put [the Plaintiffs] off the trail of inquiry."[174] The Managers contend that the Plaintiffs were on inquiry notice of the purported scheme because the Plaintiffs were given a copy of the Rating Agency Presentation which noted: "SFP underperformance y-o-y driven in part by transition of portion of business from spring planting season to autumn as part of an Early Fill program" and were invited to ask the Managers questions.[175] Thus, in the Managers' view, the Plaintiffs were apprised of the bulk and early fill sales program and were on inquiry notice that, if pursued, would have led to the discovery of the purported bad faith and fraud.

---

[173] *Pomeranz v. Museum Partners, L.P.*, 2005 WL 217039, at *14 (Del. Ch. Jan. 24, 2005) (citing *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.,* 677 A.2d 497, 504 n.7 (Del. 1996)).

[174] *Ryan v. Gifford*, 918 A.2d 341, 360 (Del. Ch. 2007).

[175] Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., Ex. 7, Verdesian Life Sciences LLC Ratings Agency Presentation, dated May 2014, at 48; Reply Br. in Supp. of Defs.' Mot. to Dismiss Pls.' First Am. Compl., at 7.

I note that it is the Plaintiffs' burden to plead facts to demonstrate that the statute of limitations was tolled.[176] The Plaintiffs have met their burden by pleading that the Managers, in possession of the KPMG Report and the United Suppliers Communications at the time, declined to give the Plaintiffs such information when they solicited the Plaintiffs' equity contribution. As to the Managers' argument that the Plaintiffs were on inquiry notice, I cannot, on this record, place the Rating Agency Presentation in context to determine whether it constituted inquiry notice. On a developed record, it may be apparent that the Plaintiffs should have pursued such inquiry, denying them the benefit of tolling. However, the record before me does not support denying a tolling exception based on inquiry notice. I also note the Defendant Managers allegedly breached an obligation in the LLC Agreement to provide yearly audited and monthly unaudited financial statements—the Defendants do not assert that such financials were delivered timely. At the pleading stage, I may infer that the financial statements were withheld in order to further conceal SFP's actual performance, which might have caused the Plaintiffs to inquire why SFP was underperforming.

Consequently, the Defendants' Motion to Dismiss the Plaintiffs' breach of contract and fraud claims in connection with the SFP acquisition is denied.

---

[176] *Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *7 (Del. Super. Feb. 15, 2013).

## 2. The Class P Unit Issuance

The Plaintiffs allege that the Class P Units were offered in breach of the Operating Agreement in order to "transfer what remains of Verdesian's value to Paine."[177] The Plaintiffs hold only Class A Units and contend that the Class P Units were structured to eliminate any return to any other class of Verdesian unitholders, including the Class A unitholders. The Plaintiffs take issue with the price of the Class P Units, their liquidation preference, and that Managers were permitted to purchase such Units.

The Plaintiffs allege that Verdesian's need for additional capital does not justify the terms of the Offering. The valuation of the Class P Units was allegedly "a price above which any rational market participants would pay" and "[t]he use of a false valuation artificially inflates the distribution preference the Class P Unit Holders will receive."[178] The "significant liquidation preference" for the purchasers of the Class P Units, according to the Plaintiffs, "edg[ed] the minority unitholders out of the capital structure."[179] The essence of the Plaintiffs allegations is that the Class P Units were priced at an artificially high price in order to dissuade purchase by Class A unitholders. The liquidation preference accordingly was limited to insiders, which will divert most (if not all) of the proceeds of a sale of Verdesian to

---

[177] First Am. Compl. ¶ 140.
[178] *Id.* ¶ 89.
[179] *Id.*

34

the Class P unitholders. In other words, existing unitholders (such as the Plaintiffs) were priced out of the Offering, and they will forfeit the bulk of the value of their Class A Units absent relief. By the Plaintiffs calculation, Verdesian would have to sell for approximately $560 million (44 times November 2018 EBITDA) for the Class A unitholders to be made whole on their investment.[180]

The Plaintiffs additionally protest that Managers who held management-specific units (M-1 and M-2 Units) participated in the Offering, so that even had the Plaintiffs participated in the offering their interest in Verdesian would have been diluted.[181]

I first turn to the latter accusation, which is unpersuasive; the fact that Managers participated in the Offering does not state a claim upon which relief may be granted. Section 8.10 of the Operating Agreement gives holders of Class A and Class A-1 Units a preemptive right—prior to a Qualified Public Offering—to purchase Units that Verdesian intends to sell.[182] This is an anti-dilution covenant. However, the preemptive rights granted in Section 8.10 "shall not apply to any issuances or sales of Units . . . (iv) pursuant to [Verdesian's] Equity Incentive Plans."[183] The Managers submit that the Class P Units offered to Managers were

---

[180] *Id*. ¶ 92.
[181] *Id*. ¶ 94. Prior to the Offering, Class M-1 and M-2 unitholders would not receive proceeds from a liquidity event until the Class A unitholders were paid in full. *Id*.
[182] Operating Agreement § 8.10(a).
[183] *Id*. § 8.10(d).

35

offered pursuant to such an incentive plan, and therefore no breach of the Operating Agreement occurred.[184] The Plaintiffs have not pled any fault with the extension of the Offering to Class M unitholders other than that it diluted the Class A unitholders. The Plaintiffs pleading that such dilution was done in bad faith is conclusory. The mere allegation that management participated in the Offering does not support an inference that such participation was in subjective bad faith because the Operating Agreement explicitly permits such participation.

Without their allegations regarding management participation, the Plaintiffs only remaining fault with the Offering is the Unit price and liquidation preference of the Class P Units. The Managers argue that under the reasoning of *WatchMark v. ARGO Global Capital LLC*,[185] notwithstanding the Offering's terms, the Plaintiffs' claim should be dismissed because the Plaintiffs had an equal opportunity to participate. In *WatchMark*, a preferred stockholder in a corporation challenged the decision by the corporation to issue a new series of preferred stock to raise capital for a merger—the issuance included a "pay-to-play" provision whereby preferred stockholders who did not participate in the issuance would have their shares converted to common to the pro-rata extent of their non-participation.[186] All

---

[184] Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., at 44 ("That is what happened here. Management was offered Class P units pursuant to a Company Incentive Equity Plan.").

[185] 2004 WL 2694894 (Del. Ch. Nov. 4, 2004).

[186] *Id.* at *1, *5.

preferred stockholders had an equal opportunity to participate.[187]  Because "[a]ny disparate treatment between the preferred stockholders [was] . . . a self-imposed consequence and not the result of any self-dealing" this Court found that the preferred stock issuance was in good faith and entitled to the protection of the business judgment rule.[188]

The Plaintiffs argue that the Offering here is distinguishable from *WatchMark*, because in *WatchMark* "there was no self-dealing by a controlling unit holder."[189] Instead, the Plaintiffs contend that the Offering "must be evaluated under the entire fairness standard on which Defendants have the burden of proof."[190]  However, as I stated in *MKE I*, "[t]he Operating Agreement provides that Managers are explicitly expected and permitted to make conflicted decisions and that the Members waive any such conflicts of interest."[191]  In order to breach the Operating Agreement a Manager must act in bad faith—that certain decisions may be allegedly conflicted does not change the contractual standard.  On the contrary, the Operating Agreement expressly contemplates and permits such transactions.  Thus, no matter the alleged conflicts in the Offering, the Plaintiffs must plead bad faith in order to survive a motion to dismiss.

---

[187] *Id*. at *5.

[188] *Id*.

[189] Pls.' Answ. Br. in Opp'n to Defs.' Mot. to Dismiss, at 55.

[190] *Id*. (citing *Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012)).

[191] *MKE Holdings Ltd. v. Schwartz*, 2019 WL 4723816, at *9 (Del. Ch. Sept. 26. 2019) (internal citations and quotation marks omitted).

The Plaintiffs make no serious effort to dispute that if *WatchMark* controls, the result would be a dismissal of the Plaintiffs' claim that the Offering breached the Operating Agreement. The Plaintiffs have not alleged they did not have an equal opportunity to participate in the Offering. Any disparate treatment between the Plaintiffs and other Class A unitholders is a "self-imposed consequence." As in *WatchMark*, where this Court found such a situation did not state a claim for bad faith, I find that the Plaintiffs have failed to allege that the Offering was made in bad faith and in breach of the Operating Agreement. Thus, the Plaintiffs claims for breach of the Operating Agreement in connection with the Offering must be dismissed.[192]

### 3. Financial Statements

The Plaintiffs contend that the Managers have breached the Operating Agreement by failing to provide the Plaintiffs with audited annual financial statements and monthly unaudited financial statements. Section 7.2(e) of the Operating Agreement requires such financial statements to be delivered to the Plaintiffs as follows: (i) within ninety days after the end of each fiscal year or as soon thereafter as is reasonably practicable for the annual statements and (ii) within

---

[192] To the extent that the Plaintiffs argue the Class P Units were intentionally overpriced to deter them from participating in the Offering, I note that the fact that insiders participated in the Offering belies this claim. Moreover, the only non-conclusory allegation of overpricing compares the offered price of Class P Units to the value of Class A Units, but this is a false comparison given the double liquidation preference inhering in the Class P Units only.

forty-five days after the end of each month for the monthly statements.[193] The

Plaintiffs allege that prior to their books and records demand they never received

annual or monthly financial statements and that they still have not received the 2017

annual financial statements.[194] The Managers do not dispute that the Plaintiffs did

not receive timely financial statements. Instead, they argue that the obligation

belongs to Verdesian—not the Managers—or, in the alternative, that the failure to

provide financial statements is an "error[] of judgment, neglect or omission," for

which the Managers are exculpated from liability.[195]

In order to survive a motion to dismiss for failure to state a claim for breach

of contract, the plaintiff must demonstrate: "first, the existence of the contract,

whether express or implied; second, the breach of an obligation imposed by that

contract; and third, the resultant damage to the plaintiff."[196] In attempting to cast the

failure to deliver financial statements as a derivative claim, the Plaintiffs have argued

---

[193] Operating Agreement § 7.2(e). The fiscal year of Verdesian ends on December 31 of each year. *Id.* § 7.3.

[194] I note that the First Amended Complaint was filed on January 14, 2019 and the yearly financial statements for Verdesian's fiscal year ending December 31, 2018 were not due until April 1, 2019. *Id.* §§ 7.2(e), 7.3.

[195] *Id.* § 7.2 ("The Company will: . . . (e) Cause to be prepared and distributed . . . audited annual financial statements . . . and monthly unaudited financial statements . . ."), § 6.4(d) ("In carrying out their duties hereunder, the Managers shall not be liable to the Company or any Member . . . for errors of judgment, neglect, or omission.").

[196] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (citing *Winston v. Mandor*, 710 A.2d 835, 840 (Del. Ch. 1997); *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1995 WL 662685, at *7 (Del. Ch. Nov. 2, 1995); *Goodrich v. E.F. Hutton Group, Inc.*, 542 A.2d 1200, 1203–04 (Del. Ch. 1988); Wright & Miller, *Federal Practice and Procedure*: Civil 2d § 1235).

that such failure resulted in damages to *Verdesian*.[197]   However, to state a direct claim, the Plaintiffs must allege that they suffered damages *as unitholders* from their non-receipt of financial statements.  While the Plaintiffs make conclusory recitations of bad faith with respect to this breach, the Plaintiffs have failed to plead that they suffered damages as unitholders from failing to receive financial statements.  The bulk of the Plaintiffs' allegations supporting their direct claims concern the SFP transaction—the alleged "damage" from that transaction was complete by the time the Plaintiffs would have received financial statements.  Moreover, the Plaintiffs' allegations regarding the Offering are not impacted by the failure to deliver financial statements.  Because the Plaintiffs have not alleged damages in connection with their failure to receive annual audited and monthly unaudited financial statements, the Plaintiffs' direct claim for breach of the contractual obligation to deliver financial statements is dismissed.

### B. Claims Against Certain Managers

The only claims in the First Amended Complaint against individual Managers that survive this Motion to Dismiss are in connection with the SFP transaction, which

---

[197] Oral Arg. Tr. 83:3–86:14 ("Well, I think the detriment to the entity with its banking relationships, with its ability to generate – to obtain credit and to operate, to not have contemporaneous financial statements. And it's – so I think it clearly is the detriment to the plaintiffs not to have this information which they're entitled to under the agreement; but it's also, you know, not a well-run company, not one that is going to be in a position to replace its debt, which is enormous, as a result of this SFP transaction, to not have audited financial statements on that.").

closed on July 1, 2014.[198] The First Amended Complaint makes little effort to assign responsibility for actions in connection with the SFP acquisition to individual Managers on the Board that approved the acts complained of—which is not necessary to sustain the Plaintiffs' claims at this pleading stage. However, the First Amended Complaint does not allege any connection of current Managers Avery or Fless to Verdesian or Paine around or before the closing of the SFP acquisition.[199] Therefore the claims against Avery and Fless are dismissed.

*C. Aiding and Abetting*

The Plaintiffs have also alleged that Paine aided and abetted the actions of the Managers. The elements of aiding and abetting are an underlying breach of duty and knowing participation in the breach.[200] As there can be no liability for aiding and abetting absent an underlying breach—I only consider whether Paine aided and

---

[198] First Am. Compl. ¶ 51.

[199] The First Amended Complaint alleges that Avery was employed by Monsanto from June 2007 to September 2016 and that Fless was employed by KKR & Co. L.P. from July 2010 to January 2017. *Id.* ¶¶ 18, 19. The Defendants have submitted that likewise, the claims against Corbacho and Berendes should be dismissed. Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., at 46. However, the First Amended Complaint alleges that Corbacho was an Associate or Senior Associate at Paine at the time of the SFP acquisition and thus, due to his employment at Paine at the time of the SFP acquisition, I decline to dismiss the claims against Corbacho on this record. First Am. Compl., ¶ 20. Additionally, while the First Amended Complaint alleges that Berendes was not appointed to the Board until August 2014 (after the SFP acquisition) it also alleges that he has been the Operating Director of Paine "since 2014" and was employed at Sygenta Corporation until March 2014. *Id.* ¶ 16. Because on this record it is unclear whether Berendes was involved with Verdesian or Paine at or around the time of the SFP acquisition I decline to dismiss the claims against Berendes.

[200] *In re Rural Metro Corp.*, 88 A.3d 54, 97 (Del. Ch. 2014).

41

abetted the Managers' alleged breach of contract and fraud in connection with the SFP acquisition.

As to the Plaintiffs' claim for breach of the Operating Agreement, the Operating Agreement is a contract and "Delaware law generally does not recognize a claim for aiding and abetting a breach of contract."[201] *Allen v. El Paso Pipeline GP Co., L.L.C.* does note that a situation may arise involving an alternative entity (such as Verdesian) where a party could aid and abet a "contractual fiduciary dut[y]."[202] Here, by contrast, the Operating Agreement *does not* import fiduciary duties by explicit contract or by default. Instead, the Operating Agreement eliminates fiduciary duties and replaces them with defined contractual duties[203] and "[w]hen parties establish a purely contractual relationship, they have chosen to limit themselves to pursuing contractual remedies against their contractual counterparties. Under those circumstances, a claim for aiding and abetting cannot be used to expand the possible range of defendants."[204] Therefore, the Plaintiffs' claim against Paine for aiding and abetting the Managers' breach of the Operating Agreement is dismissed.

---

[201] *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 193 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (citing *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172 (Del. 2002)).

[202] *Id*. at 193–194.

[203] *MKE Holdings Ltd. v. Schwartz*, 2019 WL 4723816, at *11 (Del. Ch. Sept. 26. 2019).

[204] *El Paso Pipeline*, 113 A.3d at 194 (citing *Gerber v. EPE Holdings, LLC*, 2013 WL 209658, at *11 (Del. Ch. Jan. 18, 2013)).

That leaves the Plaintiffs' claim that Paine aided and abetted the Managers fraud—a tort—in connection with the solicitation of equity for the SFP acquisition. The elements for aiding and abetting a tort are: (i) underlying tortious conduct, (ii) knowledge, and (iii) substantial assistance.[205] Paine and its affiliates appoint all of the Managers.[206] The Plaintiffs have pled Paine had knowledge of the Managers' conduct by virtue of its principals and Partners serving as Managers.[207] The Plaintiffs also allege that Paine worked in concert with the Managers—Paine's principals and partners—to solicit new cash equity from the Plaintiffs in connection with the SFP transaction.[208] Paine has not contested that it would be liable for aiding and abetting should the Managers be found liable for fraud, but forcefully argues—unsuccessfully at this stage—that the underlying liability does not exist. On this record, due to Paine's status as the majority equity holder of Verdesian, with the ability to appoint the entirety of the Board, I decline to dismiss the Plaintiffs' claim against Paine for aiding and abetting fraud.

---

[205] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *23 (Del. Ch. Nov. 26, 2014) (citing *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *4 (Del. Super. Nov. 30, 2004)).
[206] First Am Compl. ¶¶ 27, 29.
[207] *Id*. ¶ 174.
[208] *Id*. ¶ 176.

## III. CONCLUSION

For the forgoing reasons, I find that the Defendants' Motion to Dismiss is granted in part and denied in part. The parties should submit an Order consistent with this Memorandum Opinion.